In the Matter of the Extradition of Kulbir SINGH, aka Kulbira aka Kulvir Singh Barapind, aka Mahim Mehra,

No. CV. 98–5489 OWW.

United States District Court,
E.D. California.

Aug. 27, 2001.

Certification and Order of Extraditability
Sept. 18, 2001.

Stanley A. Boone, Fresno, Sara Criscitelli, Esq., Washington, DC, for Government of India.

Jagdip Singh Sekhon, Esq., Karen L. Snell, Esq., San Francisco, CA, for Kulvir Singh Barapind.

## MEMORANDUM DECISION AND ORDER RE EXTRADITION

WANGER, District Judge.

### I. *INTRODUCTION*

An evidentiary hearing was held on February 9, 13, 14, 15, 16, and March 1, 2001. Evidence was taken, legal authorities submitted, and oral argument heard and considered.

### II. *PROCEDURAL HISTORY*[1]

Plaintiff arrived in the United States at the Los Angeles International Airport on April 25, 1993, under a passport bearing the false name, Mahim Mehra. An INS officer immediately detained Plaintiff and charged him as an excludable alien under the Immigration & Nationality Act ("INA").[2] Barapind conceded he is excludable under the INA and applied for asylum and withholding of deportation under a false name, based on his alleged fear he would be returned to India and persecuted. On June 7, 1993, he applied for asylum/withholding in his true name. *Barapind v. Reno,* 72 F.Supp.2d at 1138.

On January 13, 1994, Barapind was denied asylum by an Immigration Judge (IJ). On July 26, 1994, the Board of Immigration Appeals (BIA) dismissed Barapind's appeal and barred him from claiming refugee status. Barapind sought review of the IJ decision in the United States District Court for the Central District of California in Los Angeles. On August 3, 1994, Barapind petitioned for a writ of habeas corpus in the United States District Court for the Central District of California. The District Court ordered a stay pending further hearings before the INS. On March 14, 1996, the District Court in Los Angeles remanded the asylum/withholding application for further proceedings before the BIA. Barapind appealed. On May 15, 1997, in *Barapind v. Rogers,* 114 F.3d 1193, 1997 WL 267881, *3 (9th Cir. May 15, 1997) (unpublished), the Court of Appeals for the Ninth Circuit rejected the IJ's adverse credibility determinations and faulted the IJ for treating, as established facts, India's criminal allegations made against Barapind in the extradition request. It affirmed the district court's remand, but modified the remand order for further proceedings before the IJ in the asylum/withholding case, specifically overturning the IJ's adverse credibility determinations and veracity findings as to criminal allegations made against Barapind by the Indian government in extradition documents. A modified remand order was entered by the District Court July 17, 1997,

---

1. For a more detailed account of the procedural history concerning Barapind's asylum and extradition cases up until August 2000, see *Barapind v. Reno,* 72 F.Supp.2d 1132, 1138 (E.D.Cal.1999) and *Barapind v. Rogers,* 114 F.3d 1193 (Table), 1997 WL 267881 (Text) (9th Cir.1997).

2. See 8 U.S.C. §§ 1101 et seq. (2001).

directing the BIA to readjudicate Barapind's asylum application.

On September 18, 1997, after Barapind was transferred to a detention facility in Bakersfield, California, India filed a complaint for extradition in the U.S. District Court for the Eastern District of California. Extradition is sought under the Treaty for the Mutual Extradition of Criminals between the United States of America and Great Britain ("1931 Treaty"), Dec. 22, 1931, U.S.-Gr. Brit., T.S. No. 849 (1932), made applicable to India from March 9, 1942, in accordance with article 14. *See* U.S. Dept. of State, Treaties in Force 132 (1999).

Once the extradition proceedings were initiated, the INS filed a motion to stay the remanded asylum/withholding proceedings pending before the BIA. Barapind objected. On October 30, 1997, the BIA ordered Barapind's exclusion and asylum proceeding held in abeyance pending the outcome of the extradition.

On February 17, 1998, Barapind filed a second complaint and habeas corpus petition in the Central District of California, challenging the BIA stay of immigration proceedings and seeking declaratory relief to compel the BIA to adjudicate his asylum application first and to enjoin the defendants from extraditing or in any other way interfering with his right to a final adjudication of his asylum application. On February 27, 1998, Barapind's second habeas petition was transferred to the Eastern District of California. On April 29, 1998, the Magistrate Judge, on Barapind's motion, stayed the extradition case, pending outcome of the BIA proceeding. The stay was vacated by the District Court on October 14, 1998.

On June 4, 1999, on the INS's motion, the District Court in *Barapind v. Reno*, 72 F.Supp.2d 1132 (E.D.Cal.1999) *aff'd on other grounds*, 225 F.3d 1100 (9th Cir. 2000), dismissed Barapind's second habeas petition for lack of subject matter jurisdiction and failure to state a claim as a second, successive petition, 72 F.Supp.2d at 1142; and for failure to demonstrate legal justification to stay the extradition proceedings, *id.* at 1144–47. On August 28, 2000, the Court of Appeals affirmed dismissal without prejudice on a different ground, that extradition is a separate and independent procedure from exclusion or removal proceedings under the INA; citing *Cornejo–Barreto v. Seifert*, 218 F.3d 1004, 1009–11 (9th Cir.2000), and held the BIA was authorized to hold exclusion/asylum proceedings in abeyance pending completion of the extradition. *Barapind v. Reno*, 225 F.3d at 1114.

## III. *FACTUAL BACKGROUND*

### A. *Historical Background*

This extradition arises out of events that occurred in the Indian State of Punjab in the mid–1980s to early 1990s, where Sikh insurgents sought to establish a new homeland, Khalistan. At the relevant time, the State of Punjab had a population of approximately 24 million persons, 14 million of whom were Sikhs. India has 20 million Sikhs who represent about 2% of India's population. The existing tensions in the Punjab between Sikh nationalists and the Indian Government erupted in June 1984, when Indian armed forces under General Braur launched "Operation Bluestar" to interdict Sikh rebels who had taken refuge in the Golden Temple, the holiest of Sikh shrines. This military strike resulted in extensive damage to the temple complex, the killing of at least 500 persons, and numerous casualties among civilians who were caught in the crossfire. The incident came to be known as the "Golden Temple Massacre" and was a focal point for Sikh militancy. Thirty-seven other Sikh tem-

ples were attacked resulting in the deaths of 3,000–4,000 Sikhs. Sikhs were "horrified" and alienated from the Indira Ghandi government. *See Trial Testimony and Dep. of Dr. Cynthia Mahmood, 30:10–34:4.*

In October 1984, two Sikh bodyguards assassinated Indira Ghandi to avenge the massacre. A decade of strife followed. India adopted anti-Sikh programs and 3,000–4,000 Sikh casualties were suffered. Sikh militants, in their quest for a new homeland, engaged in bombings, assassinations and other terrorist activities against the Indian Government, its local collaborators, and innocent civilians. The Government of India responded with counterinsurgency efforts, by which Indian security forces in their endeavor to suppress Sikh militants, committed human rights abuses, engaged in extrajudicial "encounter" killings, detentions without trial, and torture. *See Amnesty International, Human Rights Violations in Punjab: Use And Abuse of the Law (May, 1991).* Estimates are that between 7,000–30,000 people were killed during the Sikh separatist movement in 1991–92, and that from 30,000 to 100,000 persons were killed in the 1984–1993 period. *See Dep. of Dr. Cynthia Mahmood, 13:3–13:9.*

By the early 1990s, Indian security forces gained hegemony in the conflict and by 1994, the active armed Sikh separatist insurgency was largely contained.

### 1. *Kulbir Singh Barapind*

In 1985, Barapind, a Sikh, while a college student in Jalandhar, Punjab, India, became an active member of the All India Sikh Student Federation ("Federation"); a group committed to establish a sovereign Sikh nation of Khalistan to be created from the Punjab state. He subsequently moved up the group's hierarchy until he became president of the Federation for the District of Jalandhar, Punjab in 1988. Be-

cause of his Federation involvement, Barapind was arrested numerous times and tortured by the Indian police, then released. Cpt. ¶¶ 20–46. Despite police harassment and killing of Federation members, Barapind continued his protest activities. See *id.* ¶¶ 61–63.

Police harassed Barapind's family in an effort to obtain Barapind's surrender. Cpt. ¶¶ 51–55; 64–65. Barapind escaped from India to the United States using false documents and a fictitious identity in April 1993. Barapind was immediately detained and arrested by the INS upon his arrival at Los Angeles International Airport before entering the United States. Cpt. ¶¶ 67–86. *See Barapind v. Reno,* 72 F.Supp.2d at 1141–42.

### 2. *Affidavit of Satish Kumar Sharma*

Satish Sharma, Senior Superintendent of Police, Ferozepur, was, at all times relevant, the Police Chief for the District of Jalandhar, Punjab. He is the ranking police official and was personally responsible for investigation of all criminal cases in that district. *See Affidavit of Satish Kumar, Govt. Ex. 1, p. 2, ¶ 1.*

Chief Sharma's duties include supervising the investigations conducted by officers under his command; reading reports of investigating officers; and personally reviewing the investigation reports and statements regarding the cases against Barapind that are the subject of the extradition request. *See Affidavit of Satish Kumar, Govt. Ex. 1, p. 2, ¶ 1.* Extradition is sought in eleven cases, each covered by a First Information Report ("F.I.R."). The cases involve multiple offenses and victims. Each criminal charge against Barapind is documented by an F.I.R., which identifies the substantive violation of the Indian Penal Code, the applicable provisions of the Terrorist and Disruptive Activities (Prevention) Act (TADA), and in

certain cases, the Arms Act. No extradition is sought for violations of TADA or the India Arms Act. *See Affidavit of Satish Sharma, Govt. Ex. 1, p. 2, ¶ 2.*

### 3. *Criminal Process in India*

For all charges against Barapind, the F.I.R.s were prepared by the Head Constable or other authorized officer in the police station with jurisdiction where the offense took place. F.I.R.s set forth facts regarding each offense, all information received by the police concerning the crime, and identify specific violations of the Indian Penal Code. *See Affidavit of Satish Sharma, Govt. Ex. 1, p. 2, ¶ 3.*

After an F.I.R. is prepared, the offense is investigated by police officers. When sufficient evidence is collected to "connect the crime to the accused;" *i.e.*, there is evidence to form a reasonable belief that the accused committed the crimes charged, a document known as the "Challan" is prepared by the Station House Officer (SHO), a senior supervisory police officer. *See Affidavit of Satish Sharma, Govt. Ex. 1, p. 2, ¶ 4.*

Although India asserts Challans were prepared for all offenses in which Barapind has been charged, no Challan could be found at court for F.I.R. 100. Barapind contends two more Challans could not be located. The Challans were presented to the prosecuting agency, the District Attorney of Jalandhar District. The District Attorney reviewed the Challans to ascertain the sufficiency of the included evidence to obtain a judicial verdict against the accused. District Attorney of Jalandhar S.K. Kapoor made a sufficiency finding for every Challan asserting charges against Barapind. *See Aff. of Satish Sharma, Govt. Ex. 1, p. 2, ¶ 5.*

After the District Attorney certified the Challans, the cases were filed with Judicial Magistrates Courts in the Sub Districts of Jalandhar responsible for the police station where the case was investigated and initiated. The filing is accomplished by the Prosecution Agency (District Attorney) submitting complete case files to Judicial Magistrates in accordance with section 173 of the Indian Criminal Procedure Code, for trial to then be conducted. *See Aff. of Satish Sharma, Govt. Ex. 1, p. 2, ¶ 6.*

Satish Sharma alleges that Barapind is a fugitive from justice, could not be tried, and the Judicial Magistrate declared Barapind a "proclaimed offender," as set forth in Section 82 of the Indian Criminal Procedure Code for each of the charges in the F.I.R.s. Arrest warrants were issued for Barapind for all of the crimes. *See Aff. of Satish Kumar, Govt. Ex. 1, p. 2, ¶ 7.*

### B. *Political Background*

Dr. Cynthia Mahmood, an expert on international violence and terrorism, focused on Cypress, Punjab, and Kashmir, India, has studied the general conditions in the Punjab during the 1980s and 1990s. She offered her opinion there was a civil war in the Punjab, "although reasonable persons may disagree." Dr. Mahmood has previously been retained by the United States Department of State as a consultant in anthropology, specializing in terrorism and political violence. *See Dep. of Dr. Cynthia Mahmood, 12:1–10, 13:20–25.* A review of the events and the casualty figures during this time period shows that there was strife that engaged armed Sikh militants and Indian government forces and their agents in hostilities in the Punjab.

Beginning in 1973, the Sikhs began to agitate for a greater degree of autonomy for the Punjab. See *id.* at 38:8–16. What started out as a non-violent movement increasingly became more militant. See *id.* at 29:1–17. The uprising started in June 1984, when, on one of the holiest dates of

the Sikh calender, the Indian Army launched a large-scale military operation, code-named Operation Blue–Star, involving about 70,000 troops, using tanks, helicopters and CS gas, to attack the Golden Temple Complex, a religious shrine recognized by Sikhs, with the purpose of capturing armed Sikhs. See *id.* at 30:15–20. Although the government claimed 500 civilian deaths resulted from the Golden Temple attack, the BBC and Dr. Mahmood estimated 4,000 casualties on all sides. See *id.* at 31:4–9.

On October 31, 1984, the Prime Minister of India, Indira Gandhi, was assassinated by her Sikh bodyguards, in retaliation for her ordering the desecration of the holiest Sikh temple. See *id.* at 38:23–39:2. A wave of mass violence against Sikhs in Northern India followed, organized by the ruling Indian Congress Party, which involved killing Sikh men, raping Sikh women and systematic looting and burning of Sikh homes and businesses. *Id.* at 39:23–40:5, 41:10–43:13. It is estimated that 3,000 to 4,000 Sikhs were killed in the City of Delhi alone. See *id.* at 40:7–9.

The events of 1984 alienated a significant portion of the Sikh populace and by April 1985, several Sikh leaders met and wrote a declaration of independence to establish a separate Sikh state of Khalistan. See *id.* at 40:9–23. They also established a "defense force" of Khalistan named the Khalistan Commando Force (KCF) to fight the "revolution." *Id.* at 40:7–9. The KCF ultimately splintered into about a half-dozen guerrilla groups. *Id.* at 40:7–9. In response to armed strife in the Punjab, the Indian Government enacted the Terrorist and Disruptive Activities (Prevention) Act (TADA) on May 1985. See *Navkiran Singh, The Terrorist Laws, Law Publishers, Def. Ex. 4.* TADA granted police sweeping powers to arrest, detain, interrogate, and charge suspects accused of being

terrorists or engaging in "disruptive activities." Other laws enacted to combat Sikh militancy during this period include the Armed Forces (Punjab and Chandigarh) Special Powers Act of 1983 and the Punjab Disturbed Areas Act of 1983, which granted army, paramilitary, and police forces wide discretion in the use of lethal force, providing easy justification for, and facilitating extra-judicial killings by Indian authorities. See *Department of State, Country Reports on Human Rights Practices for 1991, p. 1390.* India also created an anti-[terrorist force known as the Black Cats to infiltrate and eliminate the Sikh militants].

By 1986, Sikh militancy increased in intensity (*id.* at 58:13–14); 525 people were killed by the Sikh militants. See *Department of State, Country Reports on Human Rights Practices for 1987, p. 1149.* The 1987 death toll surpassed the 1986 figures; 674 people were killed by August. *Id.* On May 11, 1987, the Indian government declared President's Rule (a state of emergency) in the Punjab. See *Department of State, Country Reports on Human Rights Practices for 1990, p. 1437.* Under President's Rule, the Indian federal government, "through Parliament, the President and the appointed governor, directly administer[s] the state, bypassing the elected state government." *Id.* President's Rule was extended every six months until 1992.

In 1988, popular support for a separate Khalistan state continued to be strong. Many radical Khalistan supporters ran for office and won by wide margins. See *Dep. of Dr. Cynthia Mahmood, 44:20–24.* Since Operation Blue Star in 1984, New Delhi had sought a political solution to the problems of Sikh separatism. This included a peace accord (never implemented) by Indian Prime Minister Rajiv Gandhi and Sikh

leader Harchand Singh Longowal in 1985.[3] By 1988, after achieving little progress, "the Indian government jettisoned policies aimed at finding a political solution in favor of tough counterinsurgency operations." Rajat Ganguly, *Coping with Ethnic Insurgencies: View from New Delhi*, Asia Q. January—March 2000, ¶2, at http://www.vuw.ac. nz/asianstudies/publications/quarterly/00januar y5.html (last visited Aug. 20, 2001). In May 1988, armed Sikhs again occupied the Golden Temple. Indian security forces responded with operation Black Thunder, and dispersed the militants after a two week siege, which resulted in 20 deaths. *See Department of State, Country Reports on Human Rights Practices for 1988, p. 1329.* The total number of deaths resulting from militant activity in 1988 increased, averaging about nine people killed daily, compared to three in 1987. See *id.*

In 1989, press reports indicate that through September militant activity caused 1,255 deaths, including 595 militants killed and 89 security force deaths. *See Department of State, Country Reports on Human Rights Practices for 1989, p. 1382.* Also around this time period, India's arch-rival, Pakistan, began to actively support the Sikh separatists by providing arms and a safe haven in its territory. *See Dep. of Dr. Cynthia Mahmood, 45:13–18.*

By 1990 the violence increased in intensity, with 4,987 reported deaths for that year. *See Department of State, Country Reports on Human Rights Practices for 1990, p. 1427.* Press reports show that the deaths included 467 security force members, 1,194 militants and 65 persons crossing into India from Pakistan to perpetrate, according to the Indian government, terrorist acts in the Punjab. Dr. Mahmood opined that in 1980–92, the level of violence in the Punjab was virtually a civil war. See *id.* In 1991, the year when five of Barapind's eleven alleged offenses occurred, militancy was at its zenith, with 5,890 deaths for the year, according to press reports. *See Department of State, Country Reports on Human Rights Practices for 1991, p. 1397.* Human rights abuses by both sides were rampant. While the militants in some instances indiscriminately fired at civilians and consciously targeted the relatives of police officers, government security forces responded in kind by continuing to engage in "encounter killings"[4] and torture.

In 1991 India canceled elections due to the level of strife. In 1992 Sikh independence groups boycotted elections.

In 1992, when the remaining six of Barapind's alleged offenses occurred, Sikh militancy began to wane, although it did not cease. In February of that year, a pro-India state government led by Beant Singh (a Sikh) acceded to power after winning an election boycotted by other major parties (Sikhs), in which only 22% of the electorate turned out to vote.[5] *See Dep. of Dr. Cynthia Mahmood, 60:15–18.* Now "the responsibility for counterinsurgency operations fell on the state police force, which

**3.** Later in 1985, Longowal was assassinated by Sikh militants for signing the accord.

**4.** "In the typical scenario, police take into custody suspected militants or militant supporters without filing an arrest report. If the detainee dies during interrogation or is executed, officials deny that he was ever in custody and claim he died in armed encounter with police or security forces." *Department of State, Country Reports on Human Rights Practices for 1991,* p. 1390.

**5.** In contrast, "municipal elections in Punjab's heavily Hindu urban areas were held in September amid a significantly improved security climate, with voter turnout over 70 percent." *Department of State, Country Reports on Human Rights Practices for 1992,* p. 1143.

was given special powers, weapons, and training." Rajat Ganguly, *Coping with Ethnic Insurgencies: View from New Delhi*, Asia Q. ¶ 2.

With the approval of Beant Singh's government, the Punjab police set out to crush the Khalistan movement. As in previous years, the security forces engaged in torture, extra-judicial killings, and detentions without trial. There is evidence of mass secret cremations by the Punjab police. *See Dep. of Dr. Cynthia Mahmood, 61:9–11.* Indian human rights groups estimated that 1,350 people were killed in faked "encounters" during the first nine months of 1992. *See Department of State, Country Reports on Human Rights Practices for 1992, p. 1135.* "Extrajudicial executions were also encouraged by the Punjab government's practice of offering bounties for killed militants. The chief minister [Beant Singh] told the state assembly that over 41,000 such bounties were paid between 1991 and 1993; in some cases more than one person claimed credit for the same killing." *Department of State, Human Rights Report for 1993, at* http://www.state.gov/www/global/human_rights/drl_reports.html (last visited Aug. 20, 2001).

The Sikh militants, in turn, not only targeted government security forces, but also innocent civilians, including the relatives of police. By the end of 1992, the organizational structure of the militant groups had begun to disintegrate. The leaders of the militant groups were being killed and agents of the Indian government, Black Cats, had infiltrated the militant cells in an effort to criminalize the movement. *See Dep. of Dr. Cynthia Mahmood, 19:7–11.* The U.S. State Department described the situation in 1992: "Civilian deaths in Punjab were down half from the 1991 rate, due mainly to a heavy army presence which helped keep militant activities in check. Nevertheless, the Punjab conflict remained one of the most violent in the world, with 4,049 people killed during the year ending November 30, 1992." *Id.* The 1991–1993 period experienced the most intense civil conflict in the Punjab.

By 1993, the Khalistan movement was in noticeable decline.

The claim of Indian human rights groups that Punjab police were engaged in a systematic campaign to liquidate militants and their supporters is borne out by data showing a high ratio of militant to security force casualties. Press reports indicate 589 alleged Sikh militants were killed in Punjab in 1993, compared to 23 civilians and 16 members of the security forces.

*Department of State, Human Rights Report for 1993, at* http://www.state.gov/www/global/human_rights/drl_reports.html. By 1994, Sikh militants had been largely crushed. During that year, 76 alleged Punjabi militants were reportedly killed in armed encounters, including only four in the last six months of the year. There were no deaths of police or other security force personnel. *See Department of State, Human Rights Report for 1994, at* http://www.state.gov/www/global/human_rights/drl_reports.html (last visited Aug. 20, 2001). In 1995, Beant Singh, who oversaw the successful suppression of the Sikh secessionists, was assassinated by a suicide car bombing believed to have been carried out by a Sikh terrorist group. *See Dep. of Dr. Cynthia Mahmood, 60:24–61:1.* The State Department estimated 7,039 deaths occurred in 1991–1992 from militant Sikh political turmoil. Dr. Mahmood estimates 20,000 to 40,000 deaths from that political turmoil in 1991–1992.

Dr. Mahmood acknowledged that Sikh militants did not have a formal military

organization, command structure, uniforms, or a revolutionary army. She agreed the Punjab had an historically high crime rate and cultural history of murder and revenge killings.

Dr. Mahmood opined that Barapind is a folk hero in the nature of a "saint-soldier." He is a religious-populist hero who has great popular support among Sikh separatists.

## IV. *LEGAL STANDARDS*

 In order to find that Barapind is extraditable under the 1931 Treaty, as well as under the relevant statutes and case law, the following must be shown:

(1) The judicial officer is authorized to conduct extradition proceedings; (not disputed)

(2) The court has jurisdiction over the fugitive; (not disputed)

(3) The person named in the complaint is the individual before the court; (not disputed)

(4) The applicable treaty is in full force and effect; (not disputed)

(5) The crimes for which surrender is requested are covered by the treaties; (not disputed)

(6) The conduct for which extradition is requested is considered criminal under the laws of both the requesting (India) and the requested (United States) nation; (not disputed)

(7) Competent legal evidence that would justify committing the accused for trial under the law of the requested nation (United States), if the crimes had been committed within the territory of that nation; *i.e.,* there is

probable cause to believe the accused has committed the charged crimes; [6] *see Glucksman v. Henkel,* 221 U.S. 508, 508, 31 S.Ct. 704, 55 L.Ed. 830 (1911); *see also Zanazanian v. United States,* 729 F.2d 624, 626–27 (9th Cir.1984); (disputed) and

(8) Whether the crimes meet the requirements of the political offense exception. *See Quinn,* 783 F.2d at 786. (disputed)

### A. *The Judicial Officer Has Authority And The Court Has Jurisdiction*

The extradition statute, 18 U.S.C. § 3184, directs the extradition judge to determine whether "the evidence [is] sufficient to sustain the charge under the provisions of the proper treaty." [7] Section 3184 confers jurisdiction on "any justice or judge of the United States." This extradition case is heard by a United States District Judge.

### B. *The Applicable Extradition Treaty is in Full Force and Effect*

 The complaint invokes a 1931 Treaty between the United States and Great Britain made applicable to India in 1942. A new treaty was entered into between the United States and India in 1999. The new treaty, effective on July 21, 1999, terminated the 1931 Treaty except as to cases where extradition documents had already been submitted to the court. *See Article 23(3).* The parties stipulate the treaty with the United Kingdom of Great Britain and Northern Ireland of December 22, 1931 (TS 849; 47 Stat. 212) (the "1931 Treaty") made applicable to India on

---

**6.** *See Quinn v. Robinson,* 783 F.2d 776, 790 (9th Cir.1986). There is no dispute that relator is the person sought by the Government of India.

**7.** In the Eastern District of California, jurisdiction to hear Extradition requests has not been conferred on United States Magistrate Judges.

March 9, 1942, in accordance with Article 14 of the 1931 Treaty, governs this proceeding. Treaties are to be liberally construed in favor of enforcement because they are "in the interest of justice and friendly international relationships." *United States v. Kin–Hong,* 110 F.3d 103, 110 (1st Cir.1997) (quoting *Factor v. Laubenheimer,* 290 U.S. 276, 298, 54 S.Ct. 191, 78 L.Ed. 315 (1933)).

### C. Nature of The Crimes for which Surrender is Requested Is Covered by the Treaties

Special rules apply in extradition cases that identify whether the crimes for which extradition is sought are extraditable offenses.

#### 1. Dual Criminality.

■ The doctrine of dual criminality requires that the offense for which extradition is sought be criminal under both Indian and United States law. *See United States v. Khan,* 993 F.2d 1368, 1372–73 (9th Cir.1993). India charges Barapind with murder, attempted murder, robbery (including armed robbery), and conspiracy. Indian law makes the conduct that establishes these charges criminal. *See* Indian Penal Code §§ 34, 120B, 148, 149, 302, 304, 307, 382, and 392. Title 18 of the United States Code similarly criminalizes the conduct charged. *See* 18 U.S.C. §§ 1111, 1113, 924(c) and 371 (2001). The parties do not dispute that the charged offenses meet the dual criminality requirement.

#### 2. Doctrine of Specialty

■ The doctrine of specialty prevents the requesting nation from prosecuting the extradited person for any offenses other than those crimes for which the requested country grants extradition. *See Khan,* 993 F.2d at 1372–73.

### D. Probable Cause

■ Article 9 of the Treaty provides: "[t]he extradition shall take place only if the evidence be found sufficient ... to justify the committal of the prisoner for trial." The country seeking extradition is not required to present all its evidence at an extradition hearing. *See Quinn,* 783 F.2d at 815. Nor is it the role of the district court to determine whether there is sufficient evidence to convict the accused. *See id.* Instead, "the probable cause standard applicable in extradition proceedings is identical to that used by courts in federal criminal preliminary hearings," *Sidali v. I.N.S.,* 107 F.3d 191, 199 (3d Cir.1997); *see also Charlton v. Kelly,* 229 U.S. 447, 461, 33 S.Ct. 945, 57 L.Ed. 1274 (1913); *Mirchandani v. United States,* 836 F.2d 1223, 1226 (9th Cir.1988); *Sindona v. Grant,* 619 F.2d 167, 175 (2d Cir.1980); *Castro Bobadilla v. Reno,* 826 F.Supp. 1428, 1433 (S.D.Fla.1993), *aff'd,* 28 F.3d 116 (11th Cir.1994); the extradition judge must have competent evidence to support the belief that the accused has committed the charged offenses, *see Quinn,* 783 F.2d at 815 *(citing Zanazanian,* 729 F.2d at 627). The Court of Appeal in this Circuit describes the review of probable cause, as: "by a somewhat liberal extension, whether there was *any* evidence warranting the finding that there was reasonable ground to believe the accused was guilty." *Quinn,* 783 F.2d at 790, (quoting *Fernandez v. Phillips,* 268 U.S. 311, 312, 45 S.Ct. 541, 69 L.Ed. 970 (1925)) (emphasis added); see also *Mainero v. Gregg,* 164 F.3d 1199, 1205 (9th Cir.1999) (quoting *Quinn,* 783 F.2d at 790).

#### 1. Admissible Evidence

■ A relator's ability to oppose an extradition request is limited. The Federal Rules of Evidence do not apply in an extradition proceeding. Rule 1101(d)(3),

Fed.R.Evid., provides that "[t]he rules [of evidence] (other than with respect to privileges) do not apply ... [to p]roceedings for extradition or rendition." *See In re Requested Extradition of Smyth*, 61 F.3d 711, 720–21 (9th Cir.) *amended by* 73 F.3d 887 (9th Cir.1995), *cert. denied*, 518 U.S. 1022, 116 S.Ct. 2558, 135 L.Ed.2d 1076 (1996). Although admission of evidence offered by the relator at an extradition proceeding is left to the discretion of the extradition judge, facts contradicting the requesting country's proof of probable cause or establishing an affirmative defense are inadmissible. See *Charlton v. Kelly*, 229 U.S. 447, 456, 33 S.Ct. 945, 57 L.Ed. 1274 (1913); *see also Mainero*, 164 F.3d at 1207, n. 7; and *Hooker v. Klein*, 573 F.2d 1360, 1368 (9th Cir.1978).

The relator may present evidence that *explains* away or completely obliterates the government's evidence. *Hooker*, 573 F.2d at 1369; *see also Mainero*, at 164 F.3d at 1207 n. 7, ("generally, evidence that explains away or completely obliterates probable cause is the only evidence admissible at an extradition hearing."). The subtle difference between the two is "difficult to articulate." *In re Sindona*, 450 F.Supp. 672, 685 (S.D.N.Y.1978), *aff'd sub nom. Sindona v. Grant*, 619 F.2d 167 (2d Cir.1980); *see also, e.g., Koskotas v. Roche*, 931 F.2d 169, 175 (1st Cir.1991); *Sandhu v. Burke*, No. 97 Civ. 4608, 2000 WL 191707, *5 (S.D.N.Y. Feb. 10, 2000); *Maguna–Celaya v. Haro*, 19 F.Supp.2d 1337, 1343 (S.D.Fla.1998) ("This 'somewhat murky principle' has often been cited by courts without explanation as to what constitutes evidence that explains and what constitutes evidence that contradicts."), *rev'd on other grounds*, 172 F.3d 883 (11th Cir.1999) (*per curium* ). In practice, the standard is extremely difficult to apply.

According to the Supreme Court in *Collins v. Loisel*, the line may properly be drawn between evidence rebutting probable cause and evidence to establish a defense. *See* 259 U.S. 309, 315, 42 S.Ct. 469, 66 L.Ed. 956 (1922); *see also Republic of France v. Moghadam*, 617 F.Supp. 777, 781 (N.D.Cal.1985). "[I]n admitting 'explanatory evidence,' the intention is to afford an accused person the opportunity to present reasonably clear-cut proof which would be of limited scope and have some reasonable chance of negating a showing of probable cause." *Sindona*, 450 F.Supp. at 685; *see also Sandhu*, 2000 WL 191707, *5 ("Whatever the precise boundary between admissible 'explanatory' evidence and inadmissible 'contradictory' evidence, evidence that would completely negate probable cause, is admissible in an extradition hearing.").

Extensive recantation evidence is offered by Barapind. There is a split of authority whether recantation evidence is admissible in extradition. *Mainero*, 164 F.3d at 1207 n. 7; *compare Eain v. Wilkes*, 641 F.2d 504, 511–12 (7th Cir.1981) (recanting statements refused because they constituted contradictory evidence); but see *In the Matter of Extradition of Contreras*, 800 F.Supp. 1462, 1464, 1469 (S.D.Tex.1992) (confessions, the sole evidence of probable cause, were sufficiently recanted to negate existence of probable cause).

In addition Barapind offered testimony from Rajinder Singh that called into question the reliability, completeness, accuracy, and integrity of the evidence submitted in some of the cases. He and other witnesses testified to coercive and unlawful methods, including false accusations, used by Indian government agents in the Punjab against Indian attorneys who represented Sikh militants and the militants. Rajinder testified to being in fear of reprisal for testifying in the extradition hearing. He conducted a recent (2000) investigation

of lighting conditions in the crime scene described in F.I.R. 94. He interviewed and obtained affidavits from a large number of witnesses in the cases.

## E. POLITICAL OFFENSE EXCEPTION

### 1. Statutory Basis

■ The right of a foreign sovereign to demand and obtain extradition of an accused criminal is created by treaty. See *Quinn,* 783 F.2d at 782. In the absence of a treaty there is no duty to extradite. See *Factor v. Laubenheimer,* 290 U.S. 276, 287, 54 S.Ct. 191, 78 L.Ed. 315 (1933).

> Article VI of the 1931 Treaty provides: A fugitive criminal shall not be surrendered if the *crime or offense* in respect of which his surrender is demanded *is one of a political character,* or if he proves that the *requisition* for his surrender *has,* in fact, *been made with a view to try or punish him for a crime or offense of a political character.*

TS 849; 47 Stat. 212, Art. VI (emphasis added).

■ The determination whether a crime is extraditable "under the provisions of the treaty," includes consideration of whether the crime is nonextraditable because it falls within the political offense exception. *Quinn,* 783 F.2d at 786 (citing *In re Ezeta,* 62 F. 972, 996–97 (N.D.Cal.1894)).

### 2. Burden of Proof

The cases do not clearly identify the standard of proof by which the necessary elements of the political offense exception must be judged. *See United States v. Pitawanakwat,* 120 F.Supp.2d 921, 928 (D.Or.2000) (relator has initial burden of submitting evidence to establish elements of the exception). The burden then shifts to the government "to prove that the crime charged in the Complaint was not of a political character." *Id.* (quoting *Ramos v. Diaz,* 179 F.Supp. 459, 463 (S.D.Fla.1959)). The parties both argue, when it is to their advantage, that the rules of evidence do not apply to an extradition proceeding; but no party provides controlling legal authority whether "any evidence" or a "preponderance," or some greater showing is necessary to establish the political offense exception.

Barapind contends he must prove the elements of the political offense exception by a preponderance of the evidence. See, *e.g., Ahmad v. Wigen,* 726 F.Supp. 389, 408 (E.D.N.Y.1989) (preponderance standard is the appropriate burden level and the norm in a civil case), *aff'd* 910 F.2d 1063 (2d Cir.1990).

### 3. The "American Incidence Test" (Incidental To)

The 1931 Treaty does not define a political offense. This task is left to the courts. The Ninth Circuit analyzed the historical basis and then-existing (as of 1986) state of the political offense exception in *Quinn.* *Quinn* identifies the justifications for the political offense exception:

> First is the belief that individuals have a right to resort to political activism to foster political change.... Second, the exception reflects a concern that individuals—particularly unsuccessful rebels—should not be returned to countries where they may be subjected to unfair trials and punishments because of their political opinions. Third, the exception comports with the notion that governments—and certainly their nonpolitical branches—should not intervene in the internal political struggles of other nations.

*Quinn,* 783 F.2d at 793 (citations omitted).

Political offenses generally fall within two distinct categories: pure political of-

fenses and relative political offenses. Pure political offenses, like treason, espionage, and sedition, are acts aimed directly at the government and do not contain any of the elements of ordinary crimes. See *id.* at 793. Relative political offenses, on the other hand, are otherwise common crimes committed in connection with a political act or common crimes committed for political motives or in a political context. See *id.* at 794 (citations omitted). The political offense exception applies when "the nexus between the crime and the political act is sufficiently close." *Id.* at 794 (citations omitted).

■ American courts use the "incidence" test to define a nonextraditable political offense. *Id.* at 795. In the seminal United States case, *In re Ezeta,* 62 F. 972, the extradition of a number of individuals for murder and robbery to Salvador was denied because the acts were committed during actual hostilities between contending forces in an unsuccessful effort to thwart a revolution.

The Supreme Court has considered the political offense exception only once. In *Ornelas v. Ruiz,* the Court allowed the extradition of an individual for murder, arson, robbery, and kidnaping committed at or about the time revolutionary activity was in progress. 161 U.S. 502, 510, 16 S.Ct. 689, 40 L.Ed. 787 (1896). The Supreme Court listed four factors relevant to the political offense inquiry: (1) the character of the foray; (2) the mode of attack; (3) the persons killed or captured; and (4) the kind of property taken or destroyed. *Id.* at 511, 16 S.Ct. 689. There, although the crimes were committed while an uprising was in progress, the crimes were not of a political character, because after the crime, no armed force of the Mexican government was engaged and the bandits took the stolen property referred to as "booty" across the border to Texas.

Following *Ornelas,* the incidence test has been applied with a "two-fold requirement: (1) the occurrence of an uprising or other violent political disturbance at the time of the charged offense; and (2) a charged offense that is 'incidental to,' 'in the course of,' or 'in furtherance of' the uprising." *Quinn,* 783 F.2d at 797 (citations omitted). *Quinn* observes the incidence test has been criticized as both over-inclusive and under-inclusive, but when properly applied, the test remains "workable." *Id.* at 801. This case strains the "workability" of the test.

*Quinn* suggests the need to impose limitations on use of the political offense exception, when it is applied to new methods of political violence; *i.e.,* domestic revolutionary violence and international terrorism. *Eain* imposed additional restrictions on the incidence test. These Seventh Circuit restrictions redefined the "uprising" portion of the test "as a struggle between organized, non-dispersed military forces; made a policy determination regarding the legitimacy of certain political objectives; and excluded violent acts against innocent civilians from the protection afforded by the exception." *Quinn,* at 802. *Quinn* suggests the test should be ideologically neutral; should not attempt to judge the political legitimacy of the objectives or means used, no matter how heinous. *Id.* at 803. *Quinn* excludes from the exception acts of international terrorism, which are committed abroad, not in the country run by a government that is the target of the uprising, because international terrorism seeks to promote social chaos and is not political. Extraditing an international terrorist does not interfere with internal struggles for self-determination. *Id.* at 806.

*Quinn* interprets the incidence test to: (1) "protect[-]acts of domestic violence in connection with a struggle for political self-

determination;" and (2) "not protect acts of international terrorism;" 783 F.2d at 806. *Quinn* allowed extradition because there was an insufficient level of violence outside of Northern Ireland in England where the shooting occurred, to constitute an "uprising," *id.* at 814, which "refers to a people *rising up*, in their own land, against the government of that land," *id.* at 813 (emphasis in original). Acts that took place in England were not part of a struggle by nationals of Northern Ireland to change the form of government in their own land. See *id.* at 814.

■ The incidence test has two components: (1) the "uprising" requirement that there is an "uprising," "rebellion," or "revolution," which is within the borders of the country or territory in which citizens or residents seek to change government or governmental structure; and (2) the crimes must be "incidental to" the uprising, meaning "in the course of," "connected to," "in furtherance of," "causally or ideologically related to the uprising, within the geographic confines of the place where the uprising occurs, and contemporaneous with the uprising." *Quinn* at 808–09. In evaluating the nexus between the crime and the uprising, the incidence test does not analyze: (1) the political effectiveness of the actions used to achieve the political ends; (2) the motives of the accused or the requesting nation; or (3) the organization or hierarchy of the uprising group or the relator's position in the group. See *id.* at 809. Evidence that a crime was committed purely for personal reasons such as vengeance or vindictiveness serve to rebut any presumption a political reason exists. See *id.* at 810.

■ An offense is not political simply because it is politically motivated. *See Escobedo v. United States*, 623 F.2d 1098 (5th Cir.1980); nor because committed by a politician, *see United States ex rel Ka-*

*radzole v. Artukovic*, 170 F.Supp. 383, 392 (N.D.Cal.1959) (the crime must be part of a bonafide struggle for political power and form a part of political disturbances). A common crime with political overtones "does not meet the test." *Koskotas v. Roche*, 740 F.Supp. 904 (D.Mass.1990); *United States v. Kin–Hong*, 110 F.3d at 113–14 n. 16 (financial fraud traditionally outside the political offense exception).

## F. Uprising Component

The uprising component requires proof of an "uprising," "rebellion," or "revolution" when the crime occurs. The "uprising" component "makes the political offense exception applicable only when a certain level of violence exists and when those engaged in that violence are seeking to accomplish a particular objective." *Quinn*, 783 F.2d at 807. The exception does not cover "acts that involve less fundamental efforts to accomplish change or that do not attract sufficient adherents to create the requisite amount of turmoil." *Id.* The "uprising" component is not only limited temporally, but also spatially, in that the "revolt can occur only within the country or territory in which those rising-up reside." *Id.* The Ninth Circuit did not adopt a bright-line rule to establish the proper geographic boundaries for the "uprising" component. In *Quinn*, an uprising in one political subdivision (Northern Ireland) did not necessarily extend to the English nation as a whole, nor consequently to other subdivisions. In the Second Circuit, there must be a "violent political disturbance as to constitute in effect a state of civil war." *Ahmad v. Wigen*, 726 F.Supp. 389, 408 (E.D.N.Y.1989), *aff'd* 910 F.2d 1063, 1066 (2d Cir.1990). *Eain v. Wilkes*, 641 F.2d 504, 519–20 (7th Cir. 1981), speaks in terms of "on-going, organized battles between contending armies."

## G. The "Incidental To" Component

For a criminal act to be "incidental to" an uprising, it must be "causally or ideologically related to [an] uprising." *Ornelas*, 161 U.S. at 511, 16 S.Ct. 689. "The 'incidental to' component is not satisfied by any connection, however feeble, between a common crime and a political disturbance." *Quinn*, 783 F.2d at 809 (quoting Manuel R. Garcia–Mora, *The Nature of Political Offenses: A Knotty Problem of Extradition Law*, 48 VA. L. REV. 1226, 1246 (1962)). "[I]n determining whether a rational nexus exists between the alleged crimes and the political disturbance, the focus of inquiry is on the circumstances and the status of those harmed and not merely on whether the acts were committed during the disorder." *Matter of Extradition of Demjanjuk*, 612 F.Supp. 544, 570 (D.C.Ohio 1985). "This doctrine was established to protect acts that are directed at the State itself, and not to protect every criminal act that in some sense contributes to the political goal of those committing it." *McMullen v. I.N.S.*, 788 F.2d 591, 597 (9th Cir.1986); *see also Quinn*, 783 F.2d at 798; *Eain*, 641 F.2d at 520–23. As a result, indiscriminate attacks on civilians do not fall under the political offense exception. *See Ahmad v. Wigen*, 910 F.2d at 1066 (holding that an attack on a commercial bus carrying civilians was not a political offense); *Eain*, 641 F.2d at 521 (holding that a bombing of a market area was not incidental to an uprising); *but see Quinn*, 783 F.2d at 809–10, (stating in dicta that Quinn's participation in bombings would be incidental to an uprising). Acts "committed for purely personal reasons such as vengeance or vindictiveness" may also fall outside the political offense exception. *In re Doherty*, 599 F.Supp. 270, 277 n. 7 (S.D.N.Y.1984); *accord Quinn*, 783 F.2d at 810.

The Ninth Circuit in *Quinn* applied "a rather liberal standard" of nexus to the "incidental to" prong. *Quinn*, 783 F.2d at 810. Under such a standard, there is "no justification for distinguishing ... between attacks on military and civilian targets" and such acts as "killing simply to avoid capture" or "killing to avoid disclosure of strategies," which can "be incidental to or in furtherance of an uprising." *Id.* at 810. "All the courts should do is determine whether the conduct is related to or connected with the insurgent activity." *Id.* at 810. However, *Quinn* was certified for extradition because he failed to satisfy the "uprising" component, the court did not have to reach or apply the "incidental to" component. The portion of *Quinn* that addresses the "incidental to" prong is dicta and is only persuasive, non-binding authority. *See United States v. Westlands Water Dist.*, 134 F.Supp.2d 1111, 1132–34 (E.D.Cal.2001) (pronouncements on an issue not necessary to prior 1990 decision were dicta, requiring *de novo* interpretation in the district court) (citing cases).

*Quinn* provides no guidance as to how to evaluate the nature and quality of insurgent activity nor how to determine whether crimes claimed to be committed to achieve political goals are so related as to be "incidental to." A subjective standard that looks solely to the relator's intent that the crime committed is for a political goal is an unworkable standard. *See Quinn*, 783 F.2d at 810.

In this Circuit, *Mainero*, 164 F.3d at 1207 n. 7, assumed obliterating evidence may be considered. As India notes, *Charlton v. Kelly*, 229 U.S. 447, 456, 33 S.Ct. 945, 57 L.Ed. 1274 (1913), excludes contradicting evidence without mention of evidence so contrary it "obliterates" probable cause. Because the distinction between contradictory, explanatory, and obliterating evidence is "difficult to understand,"

much less apply, Barapind's evidence was received and has been analyzed. Barapind is not entitled to a trial to determine probable cause. *See Gill v. Imundi,* 747 F.Supp. 1028, 1045 (S.D.N.Y.1990). This case exemplifies the difficulty of applying the prevailing "rules" governing what evidence may be considered in an extradition proceeding, where the relator seeks to turn the inquiry into a trial on the merits on each charge.

## V. CRIMES CHARGED

India seeks to extradite Barapind for the following offenses:

### A. *February 16, 1992, attempted murder of police officer (Case No. FIR 23)*

This charge is for attempted murder under India Penal Code Sections 301 and 304. Indian Penal Code § 301 defines culpable homicide as causing the death of a person other than the person whose death was intended. India Penal Code § 300 defines the crime of murder and requires an act which caused death (i) with the intention of causing death; or (ii) with the intention of causing such bodily injury as is known to be likely to cause death; or (iii) with the intention of causing bodily injury to any person and such injury to be inflicted is sufficient in the ordinary course of nature to cause death; or (iv) with knowledge that the act is so imminently dangerous that it must, in all probability cause death or such bodily injury that is likely to cause death, and without any excuse for incurring such risk of death or bodily injury. Murder is "doing any act with the intention or such knowledge and under such circumstances that, if he by that act caused death, he would be guilty of murder." I.P.C. § 304 prescribes the punishment for culpable homicide not amounting to murder. I.P.C. § 307 is attempt to murder, which prevents a person

from doing an act with such intent or knowledge and under such circumstances that if the act caused death, the death would be murder.

Gulzar Singh, Assistant Sub Inspector of Police (ASI), along with other police officers held a special police picket (roadblock) in the area of the Village Rurki on February 16, 1992. Barapind, Gurdeep Singh, a.k.a. Deepa, and two other unidentified individuals approached the police picket in a Maruti car. At about 30 yards from the police party, the car stopped, the occupants exited the car armed with AK-47 rifles, and engaged in a firefight with police. Barapind and Gurdeep Singh were identified by Gulzar Singh, who "knew them from earlier," through the use of "strong torch lights." Barapind and the three others started firing on the police party. The police returned fire in "self-defense." After a fifteen-minute firefight, the suspects ran away. The Maruti car was left at the scene. A search revealed the perpetrators left behind one AK-56 loaded assault rifle, two magazines of AK-56 ammunition and four pamphlets urging a boycott of the elections. The perpetrators are described as "terrorists," "doing propaganda" on workers in the village. *See Aff. of Gulzar Singh, Annexure A/1.*

Annexure A/2 is the affidavit of Kashmir Singh, Inspector of Police, who examined the case file and believed there was sufficient evidence to put the case in court. Annexure A/3 is the certification of District Attorney S.K. Kapoor who checked the Challan. Annexure A/4 is the warrant of arrest for Barapind (date illegible). Annexure A/5 is a photograph of Barapind. In Annexure A/6, Gulzar Singh identifies Barapind and verifies he signed the reverse side of the photograph. No copy of the signed photograph was submitted. Annexure A/7 is a copy of FIR 23 registered against Barapind. Annexure A/8 is

the Challan form under Indian Criminal Procedure Code 173, which charges Barapind with attempted murder. Annexure A/9 lists twelve separate cases in which Barapind is a proclaimed offender. Annexure A/10 is Gulzar Singh's statement to the Judicial Magistrate. In a supplement to the Annexure, dated May 25, 1998, Gulzar Singh identifies Barapind by signing the reverse side of a picture of Barapind. *See Statement of Gulzar Singh, Govt. Ex. 4 (original photograph).*

No physical evidence identifying Barapind as a perpetrator is submitted.

B. *June 29, 1991, murder and conspiracy to murder (Case No. FIR 52)*

These charges are murder and conspiracy to murder under India Penal Code §§ 302 and 120B. I.P.C. § 302 defines the punishment for murder. A conspiracy is defined by I.P.C. 120A as: "when two or more persons agree to do, or cause to be done,—(1) an illegal act, or (2) an act which is not illegal by illegal means...." Provided that no agreement except an agreement to commit an offense shall amount to a criminal conspiracy unless some act besides the agreement is done by one or more parties to such agreement in pursuance thereof. I.P.C. § 120B prescribes the punishment for conspiracy.

Rajinder Kaur and her husband Kulwinder Singh were sleeping in one room of their house in Rurki Khurd, Jalandhar District on June 29, 1991. They had two small sons. Rajinder's father-in-law, Sarwan Singh, and mother-in-law were sleeping outside the room on the veranda. Around 11:00 p.m. the door of Rajinder's room was opened while she was talking with her husband. Two men, whom the police report states she identified as Barapind and Ranjit Singh, a.k.a. Rana, were standing in the door of the room. Barapind pulled her husband, Kulwinder Singh,

and took him out to the veranda. Ranjit Singh stated they were there to punish Rajinder and her family for killing the father of Ranjit Singh. Kulwinder Singh asked Ranjit not to kill him. Barapind, armed with an assault rifle and Ranjit Singh, armed with a pistol, both fired at Kulwinder Singh, killing him. *See Aff. of Rajinder Kaur, Annexure B/1.* Barapind and Ranjit Singh then took Rajinder Kaur's father-in-law, Sarwan Singh, with them, struck him in the head with the iron handle of a pump and they then shot Sarwan Singh dead. They left the pump handle with the body. *See Aff. of Rajinder Kaur, Annexure B/1.*

Rajinder Kaur then went with her brother-in-law, Jaswinder Singh, to lodge a report with the police. On her way she was met at a bus stop at Goraya, by ASI Gulzar Singh who recorded and obtained her signature to her statement immediately following the killings. *See Aff. of Rajinder Kaur, Annexure B/1.* The "verified" statement submitted is not signed by Rajinder. Rajinder Kaur opines the motive for these killings was the 1973 killing by Sarwan Singh of Gurnek Singh, Ranjit Singh's father, for which Sarwan Singh was convicted.

Annexure B/2 is the affidavit of the investigator, ASI of Police, Gulzar Singh. Gulzar Singh testifies that he took the statement of Rajinder Kaur, that she signed it, and admitted before him that the statement was correct. Annexure B/3 is the affidavit of Sub Inspector (SI) Surinder Pal, who examined the case file and believed there was sufficient evidence to put the case in court. Annexure B/4 is the certification of District Attorney S.K. Kapoor, who checked the Challan. Annexure B/5 is the warrant of arrest for Barapind, dated October 15, 1991. B/6 is a photograph of Barapind. In Annexure B/7 Rajinder Kaur identifies Barapind and veri-

fies she signed the reverse side of the photograph. No original or copy of the signed photograph was submitted to the court with the original extradition request. Annexure B/8 is a copy of FIR 52 registered against Barapind. Annexure B/9 is the Challan form under Indian Criminal Procedure Code 173, which charges two counts of murder. Annexure B/10 lists twelve separate cases in which Barapind is a proclaimed offender. Annexure B/11 is Rajinder Kaur's statement to the Judicial Magistrate. In a supplement to the Annexure, dated May 30, 1998, Rajinder Kaur identifies Barapind by signing the reverse side of a picture of Barapind. *See Statement of Rajinder Kaur, Govt. Ex. 4 (original photograph).*

Barapind contests the validity of Rajinder Kaur's affidavit. He refers to the 1997 testimony at the trial of two other suspects in the same murder case, where she testified under oath she could not identify any of the shooters. Barapind presents an affidavit of Jaswinder Singh, son of the murdered, Sarwan Singh. Jaswinder Singh testifies that he was with Rajinder Kaur when she had her statement recorded by ASI Gulzar Singh. He asserts that Rajinder did not identify Barapind and Ranjit Singh as two of the assailants. Jaswinder Singh states that the police on their own accord inserted the names of Barapind and Ranjit Singh. *See Aff. of Jaswinder Singh, Def. Ex. 6.* Bikkar Singh and Chanan Kaur were the two other suspects tried in connection with the murders of Kulwinder Singh and Sarwan Singh. Both were acquitted when Jaswinder Singh and Rajinder Kaur each testified at trial that they were not able to identify any of the assailants. *See Def. Ex. 7.* No physical or fingerprint evidence identifies Barapind as a participant in these two killings.

C. *October 5, 1991, Murder and Attempted Murder (Case No. FIR 87)*

These charges are for murder and attempted murder, under India Penal Code Sections 302, 307, and 34. I.P.C. § 34 provides that when a criminal act is done by several persons in furtherance of the common intention of all, each is liable for the crime.

Rattan Singh, an agriculturist, around 60 years old, was traveling from the village of Bara Pind to attend the Bhog ceremony (a religious ceremony) of Mohinder Singh on October 5, 1991, in a jeep belonging to Thekedar Ram Tirath who was driving, with Tarlochan Singh, the bodyguard (gunman) for Ram Tirath. Tarlochan was armed with a .315 caliber rifle. Jaspal Singh was a rear seat passenger along with Rattan Singh. *See Aff. of Rattan Singh, Annexure C/1.*

At around 10:30 a.m., near the bridge over a canal in the area of the village Bara Pind, Ranjit Singh and Barapind emerged from bushes on the left side of the road, armed with assault rifles, and started firing at the jeep. The jeep stopped and drove in reverse to avoid the attack. The jeep went out of control and fell into a pit on the south side of the road. Both Barapind and Ranjit Singh continued to fire on the jeep. *See Aff. of Rattan Singh, Annexure C/1.*

Ram Tirath, Tarlochan Singh, and Jaspal Singh were killed from bullet injuries inflicted by the weapons of Barapind and Ranjit Singh. Rattan Singh survived by lying down on the back side of the jeep. The suspects ran away while still firing their assault rifles. The suspects stole .315 caliber rifles from Ram Tirath. While Rattan Singh was going to the police station to report the incident, he was met at the bus stand at Rurki Khurd by SI Ajit Singh who took and recorded Rattan Singh's statement. There is no original or

a copy of Rattan's signed statement. Ajit does not state that Rattan signed or verified his statement. *See Aff. of Rattan Singh, Annexure C/1.*

Annexure C/2 is the affidavit of SI of Police Ajit Singh. Annexure C/3 is the affidavit of SI Surinder Pal who examined the case file and opines there was sufficient evidence to put the case in court. Annexure C/4 is the certification of the District Attorney S.K. Kapoor, who checked the Challan. Annexure C/5 is the warrant of arrest for Barapind, which was issued on November 8, 1991. Annexure C/6 is a photograph of Barapind. In Annexure C/7 Rattan Singh identifies Barapind and verifies he signed the reverse side of the photograph. The original signed photograph was not submitted to the court. Annexure C/8 is a copy of FIR 87 registered against Barapind. Annexure C/9 is the Challan form under Indian Criminal Procedure Code 173. Annexure C/10 lists twelve separate cases in which Barapind is a proclaimed offender. Annexure C/11 is Rattan Singh's statement to the Judicial Magistrate. In a 1998 supplement to the Annexure, Rattan Singh identifies Barapind by affixing Rattan Singh's thumb print on the reverse side of a picture of Barapind. *See Statement of Rattan Singh, Govt. Ex. 4 (original photograph).*

Barapind contests the competence of the statements made in Annexure C/1. Barapind presents a January 13, 2001, affidavit of Rattan Singh, who states that he was unable in 1991 to give the name of the assailants because he did not know or recognize them. Rattan Singh states that about two years ago he was taken against his will by police to the police station in Phillaur and was directed to give an affidavit that implicated Barapind and Ranjit Singh in the deaths of Ram Tirath and his gunmen. Rattan Singh now declares that when in 1998 he previously told police that he knew Barapind well and that Barapind was not one of the assailants, it was because the police threatened his life and his thumbprints were forcibly imposed on a number of sheets of blank paper. Rattan Singh states that these thumb prints were then used on 'affidavits' to falsely identify Barapind as one of the assailants without Rattan's consent. *See Aff. of Rattan Singh, Def. Ex. 8.*

### D. September 6, 1992, Murder and Robbery (Case No. FIR 89)

These charges are for murder and robbery under India Penal Code Sections 302, 392, and 34. Under I.P.C. § 390 theft is "robbery" if in committing the theft the offender voluntarily causes or attempts to cause death, hurt, or wrongful restraint or fear of instant death, hurt, or wrongful restraint. Section 392 is the punishment for robbery.

On September 6, 1992, Sohan Singh was sleeping on the roof of his residence at village Tarkham, Majera, along with his wife Gurmail Kaur and sons Paramjit Singh and Kashmir Singh. His third son, Karamjit Singh and his wife, Kulwant Kaur, were sleeping in a room in the house. All three of Sohan Singh's sons were "pro-police" (collaborators) and as a result had been issued arms and ammunition by the police for "self-defense." Around 2:00 a.m. four persons, one of whom Sohan Singh identified as Barapind, came on to the roof of the residence. Sohan Singh observed his son, Kashmir, attempt to chamber a round in his rifle. At that point Barapind shot Kashmir Singh with an AK–47, killing him. Barapind then shot Paramjit Singh to death in the presence of Sohan Singh and his wife, Gurmail Kaur. The assailants asked Gurmail Kaur the whereabouts of her third son, Karamjit Singh. Gurmail Kaur, out

of fear, told the assailants Karamjit Singh was sleeping in another room. Barapind stayed on the roof and the three other assailants went downstairs to Karamjit Singh's room, broke open the door, and shot to death Karamjit Singh, and his wife Kulwant Kaur. Before leaving, the four assailants took the arms and ammunition of the three victims. Sohan Singh gave physical descriptions of the assailants and stated that an electric light bulb was on during the shooting which aided his and his wife's identification of Barapind. Sohan could not identify the other three assailants, who Sohan stated went downstairs and shot Karamjit and his wife Kulwant. *See Aff. of Sohan Singh, Annexure D/1.* Sohan did not sign, but rather is said to have affixed his thumbprint on his original statement. No thumbprinted statement was submitted with the request.

ASI Balwinder Singh took the statement of Sohan Singh, the next day, on June 9, 1992, when they met at the canal bridge of the village Thehard. Sohan did not go to the police the night of the killings because he did not want to leave, unattended, the residence and the bodies. ASI Singh observed the four dead bodies of the victims, sent them for post-mortem examination, and recovered 25 empty cartridges from AK–47 rifles at the scene. *See Aff. of Balwinder Singh, Annexure D/2.* Balwinder read over the statement with Sohan, who stated it was correct.

Annexure D/3 is the affidavit of SI Lajpat Singh, who examined the case file and believed there was sufficient evidence to put the case in court. Annexure D/4 is the certification of the District Attorney S.K. ·Kapoor, who checked the Challan. Annexure D/5 is the warrant of arrest of Barapind (date illegible). Annexure D/6 is a photograph of Barapind. In Annexure D/7 Sohan Singh identifies Barapind and veri-

fies that he signed the reverse side of the photograph. The signed photograph was not provided the court. Annexure D/8 is a copy of FIR 89 registered against Barapind. Annexure D/9 is the Challan form under Indian Criminal Procedure Code 173. Annexure D/10 lists twelve separate cases in which Barapind is a proclaimed offender. Annexure D/11 is Gurmail Kaur's statement to the Judicial Magistrate. In a supplement to the Annexure, dated May 20, 1998, Sohan Singh identified Barapind by affixing his thumb print on the reverse side of a picture of Barapind. *See Statement of Sohan Singh, Govt. Ex. 4 (original photograph).*

Barapind offered testimony from Rajinder Singh, a practicing lawyer in India, who explained that Ex. D/9 is not a Challan, nor are the documents those normally attached to a Challan. This goes to the weight of India's probable cause showing.

To challenge F.I.R. 89, Barapind presents the affidavits of several Sarpanchs (mayors) Lambardars, Panchayat members (council of village elders) and other residents of villages that were only a few kilometers from Tarkhan Mujura, the village of the slain brothers, to show they were police collaborators. *See Aff. of Tarsem Lal, Sarpanch of village Fallpota, Tehsil Phillaur, District Jalandhar, Def. Ex. 9; Aff. of Balhar Singh, former Sarpanch of village Landhra, Tehsil Phillaur, District Jalandhar, Def. Ex. 9; Aff. of Karnail Singh, former Sarpanch of village Mansoorpur, Tehsil Phillaur, District Jalandhar, Def. Ex. 9; Aff. of Mohinder Singh, Panchayat member of village Falpota, Tehsil Phillaur, District Jalandhar, Def. Ex. 9; Aff. of Pal Singh, Lambardar of village Atti, Tehsil Phillaur, District Jalandhar, Def. Ex. 9; Aff. of Bhajan Singh Tehing, former Sarpanch Gram Panchayat of village Tehing, Tehsil Phillaur, District Jalandhar, Def. Ex. 9; Aff. of*

*Kulvir Singh, Panchayat member of village Fulpota, Tehsil Phillaur, District Jalandhar, Def. Ex. 9; Aff. of Makhan Singh, Panchayat member of village Pal Kadim, Tehsil Phillaur, District Jalandhar, Def. Ex. 9; Aff. of Mohan Singh, resident of village Kang Jagir, Tehsil Phillaur, District Jalandhar, Def. Ex. 9; Aff. of Ajaib Singh, Panchayat member of village Paal Nau, Tehsil Phillaur, District Jalandhar, Def. Ex. 9; Aff. of Tehal Singh, Lambardar of village Falpota, Tehsil Phillaur, District Jalandhar, Def. Ex. 9; Aff. of Charan Das, Sarpanch of village Tehing, Tehsil Phillaur, District Jalandhar, Def. Ex. 9; Aff. of Kewal Singh, Sarpanch of village Paal Nau, Tehsil Phillaur, District Jalandhar, Def. Ex. 9; Aff. of Amrik Singh, Sarpanch of village Atti, Tehsil Phillaur, District Jalandhar, Def. Ex. 9; Aff. of Jhalman Singh, Panchayat member of village Atti, Tehsil Phillaur, District Jalandhar, Def. Ex. 9; Aff. of Gurdawar Singh, Lambardar of village Tehing, Tehsil Phillaur, District Jalandhar, Def. Ex. 9; Aff. of Rameshwar Nath, former Sarpanch of village Kang Jagir, Tehsil Phillaur, District Jalandhar, Def. Ex. 9.* All the affiants knew Kashmir Singh, Paramjit Singh and Karamjit Singh for several years, prior to their deaths. Each witness states that the three brothers were provided weapons and uniforms by the police and "terrorized" the area by killing Khalistan militants and robbing "innocent people." *See, e.g., Affidavit of Tarsem Lal, Def. Ex. 9.* Rameshwar Nath recalls that his fellow villager Param Singh was robbed of his money and watch by the three brothers at gun point. *See Aff. of Rameshwar Nath, Def. Ex. 9.* Mohinder Singh recalls that he was robbed of 15,000 rupees at gunpoint by Karamjit Singh, Kashmir Singh and Paramjit Singh. *See Aff. of Mohinder Singh, Def. Ex. 9.* The three brothers also threatened that they would kill or have the police kill anyone who reported their activities.

The Panchayats of seven or eight nearby villages, in total, about 50–60 persons, went to the police station to complain about the three brothers. *See e.g., Affidavit of Mohinder Singh, Def. Ex. 9.* The police failed to take any action and "allowed the three brothers to sit along side them as equals," while forcing the Panchayat members to stand in their presence. *See e.g., Affidavit of Pal Singh, Def. Ex. 9.* For a year-and-a-half after the brothers' deaths, their home was used as a police station, while the police provided shelter to the brothers' parents at the Ludhiana Government Quarters and gave them financial aid. *See e.g., Aff. of Kewal Singh, Def. Ex. 9.*

### E. October 26, 1991, Murder (Case No. F.I.R. 100)

These charges are for murder and attempted murder under India Penal Code Sections 302, 307, and 34. I.P.C. § 307 defines attempted murder.

Makhan Ram went to visit his sister in Mohalla Dhakka Colony, Phillaur, Jalandhar District on October 26, 1991. At 6:45 p.m. he left with Sahab Singh, aka Sahbi, to go to Sahab Singh's house. At 7:15 p.m., they were about to cross the railway tracks when two individuals on a scooter came from the railway crossing side. Makhan Ram identified the driver as Barapind, and the passenger as Gurdeep Singh, a.k.a. Deepa, who was holding an AK–47. Gurdeep Singh opened fire wounding Makhan Ram in the thigh and foot. Sahab Singh was shot to death at the scene. *See Aff. of Makhan Ram, Annexure E/1.* While enroute to the hospital at Phillaur, Makhan met ASI Inderjit Singh who took Makhan's statement. No signed statement of Makhan is submitted.

ASI Inderjit Singh recovered blood-stained earth, nine empty shells from an AK–47 and three empty Mauser shells from the shooting scene. *See Aff. of Inderjit Singh, Annexure E/2.* He took Makhan's statement at Adda Nawan Shehar, Phillaur. Inderjit does not say that Makhan verified his statement. Makhan's statement was sent to the police station of Phillaur. Two other individuals were allegedly participants in the shooting: Manjinder Singh, a.k.a. Babbu, and Manjit Singh, a.k.a. Billa. *Id.* Another witness, Kulwant Singh, resident of village Mutha-da Khurd, Jalandhar District, recognized and identified Manjinder Singh and Manjit Singh carrying assault rifles and running from the area of the tracks where the shooting occurred on October 26, 1991, at about 7:30 p.m. *See Challan, Annexure E/9.* Gurdeep Singh, Manjinder Singh and Manjit Singh have all since been killed in police encounters. *See Aff. of Inderjit Singh, Annexure E/2.*

Annexure E/3 is the affidavit of SHO Surjit Singh, who examined the case file and believed there was sufficient evidence to put the case in court. Annexure E/4 is the certification of the District Attorney S.K. Kapoor, who checked the Challan. Annexure E/5 is the warrant of arrest of Barapind, which was issued on September 18, 1993. Annexure E/6 is a photograph of Barapind. In Annexure E/7 (p. 97) Makhan Ram identifies Barapind and verifies he signed the reverse side of the photograph. No signed original or copy of that photograph was submitted. Annexure E/8 is a copy of FIR 100 registered against Barapind. Annexure E/9 is the Challan form under Indian Criminal Procedure Code 173. Annexure E/10 is a list of witnesses. Annexure E/11 lists twelve separate cases in which Barapind is a proclaimed offender. Annexure E/12 is Makhan Ram's statement to the Judicial Magistrate. In a supplement to the Annexure,

dated May 20, 1998, Makhan Ram identifies Barapind by signing the reverse side of a picture of Barapind. *See Statement of Makhan Ram, Govt. Ex. 4 (original photograph).*

Barapind challenges the competence of Makhan Ram's affidavit (Annexure E/1). Barapind presents an alternative 2001 affidavit of Makhan Ram, who now states that he did not know either of the assailants in the 1991 shootings. He says that in September 1997, the police filed "a false case" against Makhan Ram relating to "poppies," in which he was exonerated. While in custody, he was forced to sign a blank sheet of paper. The police allegedly prepared two false affidavits with that signature, in which "it is falsely made to appear" that Makhan identified Barapind and Gurdeep Singh as his assailants. Makhan asserts he did not identify Barapind through a photograph or otherwise. *See Aff. of Makhan Ram, Def. Ex. 10.*

Barapind also presents the affidavit of Kulwant Singh who states that the police came to his home seeking an affidavit from him, claiming that a week earlier he had implicated Barapind and Gurdeep Singh in the killing of Sahab Singh. Kulwant Singh was "surprised" to hear this and states that he never gave such a statement to the police and that he could not identify Barapind and Gurdeep Singh because he did not know them. *See Aff. of Kulwant Singh, Def. Ex. 11.* No physical evidence identifying Barapind as a perpetrator is submitted.

## F. October 31, 1992, Attempted Murder And Robbery (Case No. F.I.R. 113)

These charges are for attempted murder and robbery under India Penal Code Sections 307, 302, and 34.

SI Rajinder Singh was on patrol October 31, 1992, when he and other police

officers received radio messages that "extremists" had shot and injured three police employees of Police Station Rahon. Rajinder Singh, ASI Balwinder Singh, and other police employees were enroute from Lasara to Apra in a gypsy vehicle. They commenced a search of houses. At the residence of Harbhajan Singh, around 3:00 p.m., two men armed with AK–47 rifles were found running into a nearby sugarcane field in the area of the village Chokra. ASI Balwinder Singh identified the two as Gurdeep Singh, a.k.a. Deepa, and Barapind. The two fleeing suspects fired at the police "with the intention to kill them." The two suspects then took shelter in a brick kiln at Banga Road, from where they fired at the police party. HC Ranjit Singh was shot in the foot while SI Rajinder Singh was wounded in the left leg. The police and Rajinder gave pursuit. The accused stole a blue jeep, No. PB–37–0296, and drove away with their weapons. The police gave chase. The suspects then stole a white scooter, No. 14NH–6670, in the area of the village Dayalpur and succeeded in escaping. No empty cartridges were found allegedly because of crops in the field. *See Aff. of Rajinder Singh, Annexure F/1.* Rajinder took the statement of H.C. Ranjit at the Jalandhar civil hospital.

The Challan shows that statements were taken from the owner of the scooter, Ajaib Singh. The scooter was recovered from a suspected accomplice of Barapind, Paramjit Singh, who was subsequently jailed in Case No. FIR 119/92. *See Challan, Annexure F/7.*

Also submitted is the statement of Sukhpal Singh, a 31 year-old agriculturalist, who on October 31, 1992, was driving jeep No. PB 37–0256 to Apra from village Massani. When he reached the brick kiln of Kabul Singh on Banga Road at 4:00 p.m., two men with assault rifles, whom he identifies as Barapind and Gurdeep Singh,

stopped him. They car-jacked his jeep. He recognized and positively identified both assailants from prior knowledge. Gurdeep drove the jeep and Barapind was a passenger. Sukhpal's jeep was recovered at a later time. *See Statement of Sukhpal Singh, Annexure F/11.*

Annexure F/2 is the affidavit of SI Lajpat Singh, who examined the case file and found sufficient evidence to put the case in court. Annexure F/3, the warrant of arrest was issued on September 18, 1993. Annexure F/4 is a photograph of Barapind. In Annexure F/5 ASI Balwinder Singh identifies Barapind and verifies he signed the reverse side of the photograph. No original or signed copy of the photograph was submitted. Annexure F/6 is a copy of FIR 113 registered against Barapind. Annexure F/7 is the Challan form under Indian Criminal Procedure Code 173. Annexure F/8 is a list of witnesses. Annexure F/9 lists twelve separate cases in which Barapind is a proclaimed offender. Annexure F/10 is Balwinder Singh's statement to the Judicial Magistrate. Annexure F/11 is Sukhpal Singh's statement to the Judicial Magistrate. In a supplement to the Annexure, dated May 19, 1998, Balwinder Singh identifies Barapind's photograph by affixing his thumb print on the reverse side of the photo. *See Statement of Balwinder Singh, Govt. Ex. 4 (original photograph).* No physical evidence identifying Barapind as the perpetrator is submitted.

G. *November 1, 1992, Murder, Attempted Murder And Robbery (Case No. F.I.R. 114)*

These charges are for murder, attempted murder, and robbery under India Penal Code Sections 302 and 307.

ASI Balwinder Singh, with other commando reserve police, were conducting a search of a suspected house in Case No. FIR 113/92, around 5:15 a.m. on November

1, 1992. They surrounded the residence of Paramjit Singh. ASI Balwinder Singh knocked on the door. When asked whether any stranger was hiding in the residence, Paramjit Singh stated no one was there. ASI Balwinder Singh, along with Constables Jagtar Singh and Bhagwant Singh, then entered the house of Paramjit Singh. Barapind and Gurdeep Singh, who were in the house, opened fire on the police party with their AK–47s. Both Constables were shot and seriously wounded. ASI Balwinder Singh states that with light from an electric bulb he was able to identify both assailants, whom he knew from earlier contacts as Barapind and Gurdeep Singh. *See Aff. of Balwinder Singh, Annexure G/1.*

Barapind and Gurdeep Singh, along with Paramjit Singh, ran away with their arms and ammunition, after jumping over a wall. The police gave chase. At about 7:00 a.m., after reaching the village of Khanpur, the suspects went to the house of Paramjit Singh. They stole Makhan Singh's blue scooter, No. PIK–431, make Bajaj, on which they ultimately escaped, near the village Khampar. Makhan Singh later provided a description of one individual to SI Lajpat Singh, as 26 to 27 years old, five foot eight to nine inches tall with a stout body, fair complexion and holding an AK–47. He described another individual as 25 to 26 years old, five foot ten to eleven inches tall with a slim body, fair complexion, short hair, who was holding an AK–47. Both were breathing heavily as if they had been "running from a long distance." *See Challan, Annexure G/8.* The Challan describes Barapind and other perpetrators as "extremists."

Constable Jagtar Singh died from bullet injuries. Constable Baghwant Singh was wounded. ASI Balwinder Singh inspected the scene of the crime and recovered bloodstained earth. Paramjit Singh was arrested on November 8, 1992, and the scooter, without registration, was taken into custody. Gurdeep Singh was later killed in a police encounter. Barapind was declared a proclaimed offender on March 20, 1993. *See Aff. of Balwinder Singh, Annexure G/1.*

Annexure G/2 is the affidavit of SI Lajpat Singh, who examined the case file and found sufficient evidence to put the case in court. Annexure G/3 is the certification of District Attorney S.K. Kapoor, who checked the Challan. Annexure G/4 is the warrant of arrest for Barapind, dated September, 1993. G/5 is a photograph of Barapind. In Annexure G/6 Balwinder Singh identifies Barapind and verifies he signed the reverse side of the photograph. The signed original or copy of the photograph was not submitted. Annexure G/7 is a copy of FIR 114 registered against Barapind. Annexure G/8 is the Challan form under Indian Criminal Procedure Code 173. Annexure G/9 lists twelve separate cases in which Barapind is a proclaimed offender. Annexure G/10 is HC Rajinder Singh's statement to the Judicial Magistrate. In a supplement to the Annexure dated May 20, 1998, Balwinder Singh identifies Barapind by signing the reverse side of a picture of Barapind. *See Statement of Balwinder Singh, Govt. Ex. 4 (original photograph).* No physical evidence that identifies Barapind as a perpetrator is described.

Barapind contests the competence of the Government's version of the events. He presents a 2001 affidavit from Paramjit Singh, who now says at 4:00 a.m. on November 1, 1992, he awoke to the sound of gunshots. He witnessed two persons exchanging fire with 15 to 20 police officers in the fields behind his house. A short while later, the police began searching Paramjit Singh's house without his permission. When Paramjit Singh protested,

Harmail Singh, Deputy Superintendent of Police became angry and took him into custody. While in custody, Paramjit Singh was severely tortured. On November 8, 1992, he was brought in front of the Sub Divisional Magistrate, Phillaur, where he was implicated in the shootouts on October 31 and November 1, 1992 (FIR Nos. 113 and 114). Paramjit Singh was ultimately acquitted of both charges. Paramjit Singh states that none of the participants suffered any injuries in the shootout on November 1, 1992. After being shown a photo of Barapind, Paramjit Singh now states that Barapind was not involved in the exchange with the police. *See Aff. of Paramjit Singh, Def. Ex. 12.*

## H. *June 1, 1991, Murder And Robbery (Case No. F.I.R. 94)*

These charges are for murder and robbery under India Penal Code Sections 302, 392 and 34.

Special Police Officers Gorkha and Amolakh Singh and Punjab Home Guards Ravinder Kumar and Shushil Kumar were on duty around 9:00 p.m. in the area of some shops at Samri, Jalandhar District. At about this time Punjab Home Guard Budh Ram also came to the shop area. Gorkha and Ram went to get tea at a shop nearby while Amolak Singh, Ravinder Kumar, and Shushil Kumar started towards the bus stop. When the three were about 50 yards away, near the shed of the bus stop, they were fired upon by "extremists" using AK–47 rifles. All three police officers were shot and wounded. The three wounded officers along with officer Gorkha, who was still nearby, returned fire. Budh Ram went back towards the police post, came back with Punjab Home Guard Tirath Ram and rifles and also started firing. The suspects then fled into the nearby fields.

Three suspects were positively identified by Gorkha in the light of an electric bulb on the road as Barapind, Gurdeep Singh, and Baljit Singh. Two other suspects could not be identified. The suspects stole three .303 caliber rifles and ammunition from Amolakh Singh, Ravinder Kumar and Shushil Kumar. Ravinder Kumar, Shushil Kumar, and Amolakh Singh died at the site of the attack from bullet injuries. Deputy Superintendent of Police Harmail Singh testified by affidavit that all of the suspects were armed with assault rifles and shouted slogans "Khalistan Zindabad" (Free Khalistan). *See Aff. of SPO Gorkha, Annexure H/1.* The victims were all special police officers or Punjab Home Guard. The case was also filed under TADA.

Annexure H/2 is the affidavit of Harmail Singh, Superintendent of Police, Jalandhar, who recorded Officer Gorkha's statements. Annexure H/3 is the affidavit of SI Sucha Singh, who examined the case file and found sufficient evidence to put the case in court. Annexure H/4 is the certification of District Attorney S.K. Kapoor, who checked the Challan. Annexure H/5 is the warrant of arrest for Barapind, (date illegible). H/6 is a photograph of Barapind. In Annexure H/7 Gorkha identifies Barapind and verifies he signed the reverse side of the photograph. No original or copy of the signed photograph was submitted to the court. Annexure H/8 is a copy of FIR 94 registered against Barapind. Annexure H/9 is the Challan form under Indian Criminal Procedure Code 173. Annexure H/10 lists twelve separate cases in which Barapind is a proclaimed offender. Annexure H/11 is Hans Raja's, a.k.a. Gorkha, statement to the Judicial Magistrate. No supplement to the Annexure was provided. No physical evidence that identifies Barapind as a perpetrator is referenced.

### I. *November 4, 1991, Murder And Robbery Armed With A Deadly Weapon (Case No. F.I.R. 193)*

The charges are for murder and robbery armed with a deadly weapon under India Penal Code Sections 302, 392, 148 and 149. I.P.C. §§ 148 provides the punishment for rioting and 149 provides for co-participant liability for every member of an unlawful assembly.

Harjinder Singh was traveling by scooter from his village of Cheema Kalan to Jandiala on November 4, 1991. His father Sarwan Singh Cheema, ex-Member of the Legislative Assembly (MLA) and his security escort, Head Constable Paramjit Singh, SPO Mohinder Singh, SPO Raghbir Singh, and SPO Santokh Singh were enroute to Jandiala in a Government Gypsy vehicle No. PI3–1071, driven by SPO Ram Lubhaya. At about 10:15 a.m., near the canal bridge in Jandiala, a white Fiat car occupied by Gurdeep Singh, Barapind, Ranjit Singh, and two or three other persons, aged 24 to 25 years, drove up behind and passed Harjinder Singh and the gypsy and then stopped the Fiat in front of the gypsy. Barapind and the other suspects exited the car, took positions and started firing at the gypsy with AK–47 rifles. Shot and killed were Sarwan Singh Cheema, Constable Paramjit Singh, SPOs Mohinder Singh, Raghbir Singh, Santokh Singh and Ram Lubhaya. *See Aff. of Harjinder Singh, Annexure J/1.*

The suspects fled in the Fiat car towards the village of Dhangala. They stole a sten gun, two sten magazines, one S.L.R. and two magazines, one carbine and one magazine, and Mr. Cheema's .315 caliber rifle and 50 cartridges. Harjinder Singh states that Manjit Singh was also one of the suspects but that he forgot to name him while recording the First Information Report and provided the later identification on May 11, 1991. *See Aff. of Harjinder Singh, Annexure J/1.* Harjinder was enroute to the police station at Nurmehal, when he was met by SI Rajinder Singh, who recorded Harjinder's statement.

Annexure J/2 is the affidavit of SI Rajinder Singh, who recorded Harjinder Singh's statement and inspected the crime scene. Harjinder Singh's statement is in Punjabi, signed, and verified as true. In Annexure J/3 SI Sucha Singh checked the file and found there was sufficient evidence to put the case in court. Annexure J/4 is the warrant of arrest for Barapind (date illegible). Annexure J/5 is the certification of District Attorney S.K. Kapoor, who checked the Challan. In Annexure J/6 Harjinder Singh identifies Barapind and verifies he signed the reverse side of the photograph. The original or a copy of the signed photograph was not provided the court. Annexure J/7 is a copy of FIR 193 registered against Barapind. Annexure J/8 is the Challan form under Indian Criminal Procedure Code 173. Annexure J/9 lists twelve separate cases in which Barapind is a proclaimed offender. Annexure J/10 is Harjinder Singh's statement to the Judicial Magistrate. In a supplement to the Annexure dated May 22, 1998, Harjinder Singh identifies Barapind by signing the reverse side of a picture of Barapind. *See Statement of Harjinder Singh, Govt. Ex. 4 (original photograph).* No physical evidence is described that identifies Barapind as a perpetrator.

Barapind argues that evidence shows Mr. Cheema was a Communist and that Communists were regularly employed by the Punjab Police as informants against Sikh nationalists and armed vigilantes. Gurpal Singh asserts that Mr. Cheema was responsible for the 1989 murder of his son, a young man who supported the Sikh militants. He testified that Cheema was perceived by the community to be respon-

sible for the deaths of many other Sikh youth who supported Khalistan.

J. *April 26, 1992, Murder (Case No. F.I.R. 34)*

This charge is for murder under India Penal Code Sections 302 and 34.

SI Surinder Pal was on patrol with other officers when he met and recorded the statements of Nirmal Singh. Around 7:30 p.m. on April 26, 1992, Nirmal Singh, Pira Singh, and Chuhar Singh were present in the "Janj Ghar" of the village. Barapind, Gurdeep Singh, and Harminder Singh, accompanied by another young man armed with AK–47 rifles, came from the side of the road which leads from the village Dhandwar to Garhi Mohan Singh. One suspect came near the wall of the Janj Ghar. A second went in front of the house of Baghat Singh. The other two remained standing in the street. Balwant Singh Sarhal, an ex-Member of the Legislative Assembly along with Amar Nath Kanugo of the Deputy Commissioner Office, Jalandhar, and two gunmen, constables Suda Ram and Jasbir Singh, came from the side of Village Garhi Mohan Singh in a gypsy vehicle, which was driven by Balwant Singh Sarhal. Surinder Pal states that Nirmal Singh reported that Barapind, Gurdeep Singh and Harminder Singh opened fire on the gypsy and shot and killed Balwant Singh Sarhal and the three other occupants of the gypsy. The four assailants took the weapons of the gunmen of Balwant Singh and went towards the village Dhandwar. The villagers then secured the bodies. *See Aff. of Surinder Pal, Annexure K/1, Sharma Aff. p. 9.*

Surinder Pal inspected the scene of the shootings, prepared the inquest reports, took into possession seven empty AK–47 cartridges and blood-stained earth, sent the dead bodies to the hospital for postmortem examination, and completed the preliminary investigation at the scene of the crime. *See Aff. of Surinder Pal, Annexure K/1.*

Annexure K/2 is the Affidavit of Inspector Avtar Singh, who examined the case file and found sufficient evidence to put the case in court. Annexure K/3 is the warrant of arrest for Barapind, dated July 6, 1993. Annexure K/4 is a photograph of Barapind. In Annexure K/5 Surinder Pal identifies Barapind and verifies he signed the reverse side of the photograph. The court was not provided the signed photograph. No photographic identification is provided by Nirmal Singh. Annexure K/6 is a copy of FIR 34 registered against Barapind. In the F.I.R. a statement of Nirmal Singh, age 55, asserts he moved to Dubai about 15 years before and returns every 6 months to a year to see his wife and daughter-in-law, who live in the village Cheema Kalan. Nirmal had been in Cheema Kalan months before the attack.

Gulzar Singh claims Nirmal identified Barapind, Gurdeep Singh, and Harminder Singh as perpetrators of the April 26, 1992, shootings. Gulzar reports that Nirmal "said" that Chular Singh also identified Barapind and the other two assailants. Annexure K/7 is the Challan form under Indian Criminal Procedure Code 173. Annexure K/8 lists twelve separate cases in which Barapind is a proclaimed offender. There is no supplement to the Annexure. Nor is there a statement from Chular Singh.

Barapind disputes the validity of Annexure K/1. Barapind presents the Affidavit of Nirmal Singh who states that he has worked in Dubai as a mason since 1977 and only returns to India once a year. He was at his village on April 26, 1992 at 7:30 when some young men approached the village from a paved road. When a white jeep drove by, they started firing shots at it. Nirmal Singh and other villagers were

scared and hid in the streets. After the shooting had ended, the villagers saw that four people were lying dead in the jeep, one of whom was Balwant Singh an ex-MLA. When the police arrived, they took Nirmal Singh's statement. However, the police, on their own, "inserted into his statement that Nirmal Singh had identified the assailants as Barapind, Gurdeep Singh and Harminder Singh." Since Nirmal Singh had continually lived in Dubai for the past 15 years, Nirmal now states he did not know any of the young men from the area, nor did he identify or name any assailants for the police. *See Aff. of Nirmal Singh, Def. Ex. 13.*

K. *October 13, 1992, Murder And Robbery (Case No. F.I.R. 220)*

These charges are for murder and robbery under Sections 302, 382 and 34 of the India Penal Code. I.P.C. § 382 is the crime of theft after preparation for causing death, hurt, or restraint in order to commit the theft.

SPO Romesh Kumar, who worked as a security guard for Darshan Singh Kaypee, ex-Minister of Punjab, was driving on October 13, 1992, along with Mr. Kaypee, his children Rosy, Pinto and Guddu and his gunman Ashok Kumar in a Maruti car, No. PI308–D010 from a farm at Khural Kingra. At 5:45 p.m., two armed young men wearing turbans were waiting near the Deep property at Kuki Dahaba of Khurla Kingra, Mithapur Road. They signaled for the car to stop and opened fire on the car. Romesh stopped the car and jumped into a pit to avoid being shot. Mr. Kaypee and his gunman Ashok Kumar were killed by the gunfire. The suspects took a carbine rifle with live cartridges. *See Aff. of Romesh Kumar, Annexure L/2.* Romesh's affidavit states he identified the assailants, but does not name them. The affidavit submitted is not signed.

Raghbir Singh, Deputy Superintendent of Police, Jagraon District, Ludhiana, learned that on October 19, 1992, that Darshan Singh Kaypee, and his gunmen, were killed on October 13, 1992, by Tarlochan Singh, Gurdeep Singh, and Barapind. On October 27, with the help of an informant, Raghbir Singh arrested Tarlochan Singh. Tarlochan Singh confessed and inculpated Barapind and Gurdeep Singh, who he names as co-perpetrators in the killing of Darshan Singh Kaypee and his gunman. Tarlochan Singh also purportedly stated that on March 15, 1992, SI Mann Singh of Garha, was murdered by Barapind and his accomplices. From Tarlochan Singh were seized: five high explosive 36 hand grenades, one .38 caliber revolver along with live cartridges, and 15 kilograms of explosive material.

A separate F.I.R. 167/22 was registered at Nakoder for the weapons charges. Tarlochan Singh was killed by security forces in a cross-fire during a rescue attempt. F.I.R. 168/92. *See Aff. of Raghbir Singh, Annexure L/1.*

Annexure L/3 is the warrant of arrest for Barapind, dated September 17, 1993. Annexure L/4 is a photograph of Barapind. There is no supplement to the Annexure.

Barapind challenges F.I.R. 220 with the 2001 affidavits of Narinder Singh, Om Prakash, Resham Singh, and Ramesh Kumar, to show that Tarlochan Singh was non-violent, was not involved in Darshan Singh Kaypee's murder, and any allegations he made were procured through torture. *See Post–Mortem Report, Def. Ex. 14; Aff. of Narinder Singh, Def. Ex. 15; Aff. of Om Prakash, Def. Ex. 16; Aff. of Resham Singh, Def. Ex. 17; and Aff. of Ramesh Kumar, Def. Ex. 18.* Narinder Singh, son of Tarlochan Singh, states that his father participated in the activities of Simranjit Singh Mann's party. Since Mr. Mann's party protested against "police atrocities

and oppression," they were targeted by the Punjab Police. Mr. Mann testified in open court and confirmed he was non-violent, did not advocate violence, was incarcerated for a number of years for his political beliefs, and was tortured by Indian authorities. On October 13, 1992, Tarlochan Singh was arrested by the police and held in custody until the night of October 15, 1992, when the village Panchayat, along with senior residents, secured his release.

The next morning, the police again arrested Tarlochan Singh along with his son Narinder and took them to CIA Staff, Jalandhar. Tarlochan and Narinder were then severely beaten by the police, under the supervision of SP (D), Chahal. Narinder Singh witnessed the police asking his father to admit that he, along with Barapind and Gurdeep Singh killed Darshan Singh Kaypee. When Tarlochan Singh refused, the police began to torture him. The police released Narinder Singh on October 20, 1992, and told him he would be killed if he discussed what had occurred at the station. Narinder Singh contacted his village leaders and other influential people in the locality, who then tried to secure Tarlochan Singh's release. On October 28, 1992, Tarlochan Singh was killed in what the Punjab Human Rights Organization called a "fake police encounter." Tarlochan Singh was not involved in the murder of Darshan Singh Kaypee. During the time Narinder Singh was in police custody along with his father, Tarlochan Singh, he denies any knowledge or involvement. *See Aff. of Narinder Singh, Def. Ex. 14.*

Om Prakash is the Sarpanch of village Dhanal Kalan, District Jalandhar, the residence of Tarlochan Singh. Om Prakash met Tarlochan Singh on October 26, 1992, when he was in police custody. Tarlochan Singh had been severely tortured. His fingernails had been pulled out and he was given electric shocks. Tarlochan Singh stated that he was being pressured to confess to the murder of Darshan Singh Kaypee but was not involved in the incident. When Om Prakash learned that Tarlochan Singh was killed by police in a false encounter, he went to retrieve the body but was told that it already had been cremated. *See Aff. of Om Prakash, Def. Ex. 16.*

Resham Singh is a resident of village Dhanal Kalan, District Jalandhar. Resham Singh, along with other influential people from the village, went to secure Tarlochan Singh's release at the time he was initially arrested. When Resham Singh inquired as to why Tarlochan Singh was arrested, he was told by the Station House Officer at Labhra that if he continued to speak he would also be arrested. When Tarlochan Singh was initially released, Resham Singh observed that he had been severely beaten and was in critical condition. Resham Singh states that the charges against Tarlochan Singh are completely false because Resham Singh knew Tarlochan Singh personally and he was "not the sort of person who would take part in criminal acts." *See Aff. of Resham Singh, Def. Ex. 17.*

The post-mortem report of Tarlochan Singh states that the cause of death was "double hemorrhage shock and brain injury which are sufficient to cause death in an ordinary course of nature." Numerous circular wounds were noted on the body. *See Post–Mortem Report, Def. Ex. 14.*

Ramesh Kumar now asserts he worked as a gunman for Darshan Singh Kaypee and was with Kaypee on October 13, 1992, when he was killed. Ramesh Kumar survived the ambush when he jumped out of the car. The police later asked him to identify a photograph of a Sikh youth and forcibly obtained his signature on blank paper. Ramesh Kumar could not recognize any of the assailants and did not sign

any affidavit that stated he identified any assailant. *See Aff. of Ramesh Kumar, Def. Ex. 18.*

## VI. ANALYSIS OF PROBABLE CAUSE

A. *Sufficiency of Government Evidence*

■■■■ India submits no physical evidence linking Barapind to the crimes. Its proof is comprised almost entirely of alleged eye-witness statements summarized by Sharma. Eye-witness testimony, if accepted, is sufficient to extradite a fugitive. *See Collins,* 259 U.S. at 317, 42 S.Ct. 469 ("unsworn statements of absent witnesses may be acted upon by the committing magistrate"). Moreover, an extradition request may be based entirely on an investigator's affidavit summarizing other witnesses' statements and information, with the caveat that they are properly authenticated.[8] *Emami v. U.S. Dist. Ct.,* 834 F.2d 1444, 1451 (9th Cir.1987) (foreign prosecutor's affidavit with summaries of statements admissible), quoted in *Mainero,* 164 F.3d at 1206; *Zanazanian v. United States,* 729 F.2d 624, 627 (9th Cir.1984) (police reports containing multiple hearsay considered sufficiently reliable to be competent). Evidence is not inadmissible simply because it is hearsay. *Emami,* 834 F.2d at 1451.

Exhibit 1 includes a "certificate to be Attached to Documentary Evidence Accompanying Requisitions in the United States for Extraditing" signed and sealed by Matthew P. Daly, Charge d'affaires and interim consular official of the United States at New Delhi, India, on November 27, 1994. Ex. 1 includes the declaration and certification of Samuel Witten, Attorney–Advisor in the office of the Legal Advisor of the United States Department of

State, Washington D.C., authenticating a diplomatic note requesting extradition of Barapind and a copy of the extradition treaty in force, declaring that the offenses for which extradition is sought are covered by the treaty and confirming the United States diplomatic officer in India properly certified the documents supporting the request for extradition as required by 18 U.S.C. § 3190. The initial request for extradition and its annexures were submitted November 29, 1994.

Here, none of the copies of affidavits of the civilian eye-witnesses presented with the written declarations are signed by the witness, although some of the typed documents indicate a place for the witness to sign. The affidavits purport to be verified to the reporting officer as correct as to their contents by each eye-witness. The original witness statements submitted in 1994 are uncertified translations in the English language.

On March 6, 1995, Police Chief Sharma sought to remedy any shortcomings by executing a "supplemental affidavit:"

> Immediately following my previous affidavit is sworn statement of Mr. Dinkar Gupta, Sr. Supt. of Police, Jalandhar, listing attachments, including statements of witnesses and police officers which are the part of the request with respect to the statements of the witnesses and police officers, each is accurate English translation of his statement given in Punjabi to the magistrate or entered in the case diary of an investigating officer. [sic]

*Govt. Ex. 3, p. 2.*

Sharma's supplemental affidavit also refers to listed F.I.R.s and Challans, as accurate translations from Punjabi to English. While there is a two page document follow-

---

**8.** The Government's affidavits and statements are facially authenticated under 18 U.S.C.

§ 3190 by the Declaration of Samuel Witten. Government's Exhibits 1, 3, 4, and Ex. 2, ¶ 6.

ing Sharma's September 30, 1993, affidavit listing submitted documents, it is not a "sworn statement," and only refers to this larger number of documents as "complete." *See* Govt. Ex. 1, pp. 12–13. The 1993 Sharma affidavit does not state that he accurately translated the witness statements, or that someone else did the translations, or the basis for his opinion that the "statements of the witnesses and police officers" contained in India's extradition request are accurate translations. *Id.* The "Gupta sworn statement" referred to by Sharma in Ex. 3, p. 2, asserts that "all the available documents of cases under which the extradition of Kulbir Singh ... is being sought are complete in every respect." *Id.* at 13. This is untrue as original signed and verified witness affidavits were not submitted in every case, nor were the original signed photographs allegedly used by witnesses to identify Barapind.

In the 1994 submission, it is represented that all the eye-witnesses' affidavits that purport to identify Barapind, do so by the witness signing or thumbprinting the reverse side of a photo of Barapind to confirm the identification. The original photos were not submitted. In the 1994 submission, only a copy of the same photographic image of Barapind was submitted. Many are illegible. The reverse sides of the copies of photos that purportedly bore an identifying witness signature or thumbprint were not submitted. *See Annexures A/6, B/7, C/7, D/7, E/7, F/5, G/6, H/7, J/6, K/5.*

■ The Supreme Court in *Neil v. Biggers* requires the reliability of any identification to be determined under the 'totality of circumstances.' 409 U.S. 188, 199, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972). Factors to be considered in evaluating the reliability of identifications include: (1) witness' degree of attention; (2) the accuracy of the witness' prior description of the

criminal; (3) the level of certainty demonstrated by the witness at the confrontation; and (4) the length of time between the crime and the confrontation. *Id.* at 199–200, 93 S.Ct. 375. The first three identification factors are for the most part not addressed in the eye-witness statements. Only two eye-witnesses refer to any identifying characteristic of Barapind, his age. No description of the basis of each witnesses' knowledge of Barapind is provided, no reference to any personal relationship or knowledge of the witness is stated, only the conclusion that Barapind was "known to me earlier." A–1, B–1 (I.D. only—no statement of prior knowledge), C–1 (I.D. only—no statement of prior acquaintance), D–1 (I.D. only—no statement of prior acquaintance), E–1 (I.D. only—no statement of prior acquaintance 4), F–1 (I.D. only—no statement of prior acquaintance), G–1, H–1 (police I.D. only—no statement of prior acquaintance); J–1 (civilian witness I.D.—no prior acquaintance described), K–1 (civilian witness I.D. only—no statement of prior acquaintance), L–1 (SPO eye-witness no identification; undisclosed informant—made I.D., Tarlochan Singh, who was allegedly tortured and killed, named Barapind as accomplice).

To confirm the "certainty" of identification, in the crimes committed after sundown, each witness refers to lighting conditions.

As to the fourth factor, timeliness, it is not stated exactly when the eye-witnesses identified Barapind as the perpetrator by "signing" the reverse side of Barapind's photograph. There is no information when, where, or in whose presence the photographs were signed. Almost every eye-witness statement, including identifications, were made to investigating officers in the field or at a police station the same day or the day after the crimes. Each F.I.R. provides an investigating officer's

statement that the identification of Barapind was made immediately after or within one day following the crime. In a number of statements the eye-witness is said to have met the reporting officer en route to the police station.

India recognized the unsigned photographs problem, but instead of producing the original signed photographs, provided a new set of copies of signed identical photographs of Barapind, dated in 1998, in eight of the eleven cases (no new identifications were provided in FIR nos. 34—Annexure K; 94—Annexure H; and 220—Annexure L). *See Statement of Gulzar Singh, Govt. Ex. 4, Statement of Rajinder Kaur, Govt. Ex. 4, Statement of Rattan Singh, Govt. Ex. 4, Statement of Sohan Singh, Govt. Ex. 4, Statement of Makhan Ram, Govt. Ex. 4, Statement of Balwinder Singh, Govt. Ex. 4, Statement of Balwinder Singh, Govt. Ex. 4, and Statement of Harjinder Singh, Govt. Ex. 4.* These supplemental signed photographs of Barapind and accompanying translated affidavits were submitted June 12, 1998. Ex. 4.

The production of the original signed photographs would have had the greatest probative value. The new identification photos were not signed until five and a half years after the crimes. *In the Matter of the Extradition of Sandhu,* where India sought to extradite two Sikhs for certain crimes, held the "[m]ost significant[ ]" reason why a photographic identification of the relator was insufficient to establish probable cause was that the identification took place a year and a half after the criminal incident. 1997 WL 277394 (S.D.N.Y. May 23, 1997) at *7 *aff'd in part, remanded in part sub nom. Sandhu v. Burke,* 2000 WL 191707. *Sandhu* questioned the reliability of the photographic identification due to the procedure of only presenting the photograph of the relator to the witness and no others. *In the Matter*

*of Extradition of Sandhu,* 1997 WL 277394 at *7, if *Quinn,* 783 F.2d at 819 (no per se rules for which identification procedures are competent; an identification does not have to follow United States procedures for admissibility.) *Zanazanian,* 729 F.2d at 627.

Here, there is no description whatsoever of the manner in which both the first photographs (assuming they exist) and the second signed photographs were initially presented to the eye-witnesses; whether the witnesses were shown photographs of different individuals (photo line-up), or only a photograph of Barapind. It also cannot be determined whether at the time the second photographs were signed, the witnesses independently identified Barapind as the perpetrator without regard to the first signed photographic identifications or whether they were simply requested to replicate their earlier photographic identification without re-identifying Barapind.

■ Although India's identification evidence is subject to substantial question and may be insufficient to meet the evidentiary burden of proof beyond a reasonable doubt required in a U.S. courtroom, this proceeding is not a trial on the merits. *See Collins,* 259 U.S. at 316, 42 S.Ct. 469; *Bozilov v. Seifert,* 983 F.2d 140, 143 (9th Cir.1992). India is not required to present all its evidence in an extradition proceeding. *See Quinn,* 783 F.2d at 815. Chief Sharma's affidavit reports that each witness identified Barapind from personal knowledge, without regard to the photographs. Photographic identifications can be an important factor establishing probable cause. *Escobedo v. United States,* 623 F.2d 1098, 1102, n. 10 (5th Cir.1980); *Ntakirutimana v. Reno,* 184 F.3d 419, 428 (5th Cir.1999). Here, the original photographs are of marginal, if any, value. Though corroborating evidence could improve the

credibility of India's case, uncorroborated witness statements can by themselves establish probable cause. *See Bozilov,* at 983 F.2d at 143; *Zanazanian,* 729 F.2d at 626–27.

■■■ India has also presented investigative reports or eye-witness statements, civilian or police, that identify Barapind in each case except F.I.R. 220, Annexure L. The last case, F.I.R. 220, is based on the identifications of an undisclosed informant, and Ramesh Kumar, an S.P.O. and bodyguard for the victim Kaypee, who only describes the assailants as two young men in turbans. Annex. L/1. The police officer who makes the photographic I.D., does not state that the informant identified Barapind's photo. "[T]he credibility of witnesses and the weight to be accorded their testimony is solely within the province of the extradition magistrate." *Quinn,* 783 F.2d at 815. Probable cause determinations must be made for each of the eleven cases and each of the included crimes. Probable cause to believe Barapind was a perpetrator of the murders with which he is charged can be established by uncontested statements made by eye-witnesses who identify him in statements and also by means of a photograph presented to them, supported by affidavits, which each affiant purports to say is correct, detailing their observations of the crimes. This is facially competent evidence. The difficult decisions in this case turn on substantial contradictory, conflicting, and in some instances totally inconsistent evidence submitted by Barapind to "explain" or "obliterate" all the evidence that supports the charges, in a proceeding that cannot be a trial, in which the rules of evidence do not apply, and in which credibility determinations are all but impossible to make. Barapind has also presented substantial evidence questioning the reliability and integrity of evidence provided by India's police forces' and agents; including purportedly fabricated evidence, torture, and coercion to obtain confessions.

B. *Barapind's Recantation Evidence*

Barapind seeks to defeat the presumption of probable cause by presenting affidavits in which some persons, primarily civilian eye-witnesses to the crimes, recant their earlier statements to Indian authorities which implicate Barapind. The premise underlying the evidence is that any testimony or exhibits submitted by Barapind are credible and reliable and some of India's evidence can be believed. Neither side suggests how such credibility determinations should be made. India argues "reject all Barapind's evidence." Barapind argues "accept it." The case law is split on the admissibility of recantation evidence. In *Eain v. Wilkes,* the Seventh Circuit excluded recantation evidence that contradicted or challenged the credibility of the facts implicating the relator. 641 F.2d 504, 511–12 (7th Cir.1981); *see also Bovio v. United States,* 989 F.2d 255, 259 (7th Cir.1993) (excluded recantations related to credibility); *In re Extradition of Orellana,* 2001 WL 266073 at *6 (S.D.N.Y. Mar. 15, 2001) (excluded recanted confession found unreliable and "defying common sense").

Several courts have accepted recantation evidence. In *Matter of Extradition of Contreras,* the court admitted and credited recantation testimony as negating probable cause, finding it not just contradictory, because there was no evidence to support probable cause except the unrecanted confessions. 800 F.Supp. 1462, 1469 (S.D.Tex. 1992); *see also Sandhu v. Burke,* No. 97 Civ. 4608, 2000 WL 191707, at *16 (S.D.N.Y. Feb. 10, 2000) ("should consider recantations if they tend to obliterate probable cause."); *Maguna–Celaya v. Haro,* 19 F.Supp.2d 1337, 1343 (S.D.Fla.

1998) (recantations that totally negate probable cause admissible), *overruled on other grounds*, 172 F.3d 883 (11th Cir. 1999) (per curiam); *Republic of France v. Moghadam*, 617 F.Supp. 777, 783 (N.D.Cal.1985) (recantation evidence must be considered where it tends to negate sole grounds for probable cause); *Application of D'Amico*, 185 F.Supp. 925, 930 (S.D.N.Y.1960) (testimony that has been completely recanted, has little probative value); *United States v. Linson*, 88 F.Supp.2d 1123, 1126 (D.Guam 2000); *see also Mainero*, 164 F.3d at 1207 n. 7 (9th Cir.1999) ("We have never determined this issue [recantation evidence] and have no need to do so here") (recantations that completely obliterate probable cause are not contradictory evidence).

The majority of cases suggest that if recantation evidence obliterates probable cause, it is appropriate for consideration. India argues none of the recantation evidence is admissible because it is contradictory, inconsistent, and requires a trial to resolve the credibility conflicts. This case is analogous to *Contreras*, where the court allowed the recantations of eleven witnesses, who were coerced into accusing *Contreras* of smuggling weapons. The court weighed the evidence and concluded the recantations were reliable, in part because the original incriminating statements were not of the witness' own making, but were pre-written statements that only required the witness' signature. *See Contreras*, 800 F.Supp. at 1468. Because no other evidence was submitted to establish that *Contreras* committed the offenses charged, the extradition request was denied. *See id.* at 1469. Here, the only evidence linking Barapind to the crimes charged is eye-witness statements, which if totally and truthfully recanted by those eye-witnesses under reliable circumstances would obliterate probable cause.

*Eain* is distinguishable. There, the relator's accomplices inculpated him in open court; their later recantations made to private counsel while the witnesses were in custody, were not as reliable. *See Eain*, 641 F.2d at 511. *Contreras* distinguished *Eain*:

> Obviously, where the indicia of reliability is on the prior inculpating statement, then a recantation, if admitted, would not negate the existence of probable cause; or if the recantation only controverted a prior inculpating statement, then it would not rebut the probable cause evidence. However, where a prior statement is shown to be coerced and the indicia of reliability is on the recantation, then the subsequent statement negating the existence of probable cause is germane.

800 F.Supp. at 1469. *Contreras* admitted and relied on recantation evidence where the initial inculpatory statement was suspect and the recantation reliable and trustworthy. *See also Sandhu*, 2000 WL 191707, *16 n. 12 (distinguishing *Eain* on the basis that "in *Eain*, unlike here, the recantations were not made in open court and the recanted statements were not the sole basis for the extradition court's probable cause finding.").

Neither party has provided evidence about the totality of circumstances under which the original statements were taken from each eye-witness. Most original statements of civilian witnesses were taken by an officer in the field, while the witness was en route to the police station immediately or shortly following the crimes. No foundational description of the basis for the civilian eye-witness' knowledge of Barapind is provided. The absence of physical evidence and lack of corroborating circumstances focuses the entire credibility of India's cases against Barapind on these eye-witnesses. India argues the court can

**1018**

go no further in the legal evaluation of probable cause, because no contradictory evidence can be considered from the same witnesses that concern the reliability and trustworthiness of the affidavits. It relies on two Fourth Circuit cases that hold showing a single photograph of a person previously known to the eye-witness is not unlawfully suggestive. *See United States v. Morsley*, 64 F.3d 907, 917 (4th Cir.1995), *United States v. Burgos*, 55 F.3d 933, 942 (4th Cir.1995).

Barapind has obtained recantations that were made in India five and one-half to seven years after the crimes were committed, to a private Indian attorney, Navjiran Singh, engaged by relator's counsel with the assistance of relator's brother. Attorney Navjiran did not initially contact the witnesses; Barapind's brother did. No affidavit or testimony was submitted by Barapind's brother. The now affidavits are properly notarized, authenticated statements made under oath, accompanied by certified translations, which were provided to the attorneys for India before the evidentiary hearing. Along with the English translations, copies of the original recanting affidavits in Punjabi are provided with the recanting witness' original signature to the affidavits.

■ The recantations would be more reliable had they been made under oath in open court, subject to cross-examination. This is not required. The costs and difficulty associated with bringing the eye-witnesses from India to testify in the United States are substantial, if not prohibitive. There is a legal preference that the requesting nation not be required to produce witnesses in an extradition case. *See Zanazanian*, 729 F.2d at 626–27. However, none of the original witness statements India proffered was made in open court and each suffers from a similar lessened "indicia of reliability," when contrasted

with the inculpating statements at dispute in *Eain*.

Barapind argues India's refusal to permit discovery in India and refusal to issue travel visas to relator's counsel effectively prohibited questioning under oath of the recanting witnesses in India by both sides. Although India prevented the court from having more complete information to evaluate the original statements and recantations, India rejoins there is no right to take such discovery. There is no requirement that the requesting nation send its citizens to the extraditing country to confront the accused or by inference, the converse. *See Quinn*, 783 F.2d at 815 (citing *Zanazanian*, 729 F.2d at 626–27). India argues its decision to deny travel visas to Barapind's counsel is a political matter of state and international comity, to which an extradition court cannot ascribe an evidentiary adverse inference.

Other cases where recantations lacked indicia of reliability include *Bovio*, which is distinguishable because there the alleged recantations did not pertain to the petitioner and the inculpatory statements about the petitioner were corroborated, at least in part, by other evidence. Similarly, in *Orellana*, 2001 WL 266073 at *6, Orellano's claim of a coerced confession was unreliable in light of other corroborative evidence, including his voluntary videotaped confession. *See id.* The recantations Barapind offers run the gamut from obliterating to contradictory.

Considering India's evidence as a whole, all its original affidavits are uncertified translations. No evidence exists about the circumstances under which the first set of photographic identifications was obtained. They are all identical. The second photographic identifications took place five and one-half to seven years after the crimes were committed, and there is no evidence as to the circumstances under which the

re-identifications were conducted. At one end of the spectrum is one eye-witness, Rajinder Kaur, who, after she gave her first statement to Indian police, testified five years later under oath in an Indian courtroom in a trial concerning the same events, that she could not then make and had never made an identification of Barapind as the killer of her husband and father-in-law; to another identification by Tarlochan Singh, an alleged accomplice, who incriminated Barapind after being tortured. Except for crimes in which the eye-witnesses were employed by the Indian government or were opposed to the Khalistan movement (FIR nos. 23, 89, 94, 113, 114, and 193) (FIR 220, SPO Romesh Kumar, gunman (could not and did not identify Kaypee's attackers)), in all but one case, sworn recantations are offered, affirmatively stating that the witness did not make the purported identification of Barapind. F.I.R. Nos. 34. 52, 87, and 100. The remaining charge, F.I.R. No. 220, is based on the allegedly coerced confession of Tarlochan Singh, who died after torture by Indian police.

Barapind's second ground for attack on the competency of India's evidence is based on affidavits and expert opinion that India's evidence is fabricated, obtained by torture or coercion, unreliable and untrustworthy. No clear evidentiary standards provide practical guidance as to how and under what circumstances to receive and evaluate such evidence. "The credibility of witnesses and the weight to be afforded

their testimony is solely within the province of the extradition magistrate." *Quinn*, 783 F.2d at 815 (citing *Garcia–Guillern v. United States*, 450 F.2d 1189, 1192 (5th Cir.1971)). India, through the United States Attorney, has repeatedly argued none of Barapind's evidence is admissible, because the recantations contradict or are inconsistent with India's evidence.[9] India does not address the issue of "competent" evidence discussed in *Quinn*, 783 F.2d at 815, and *Zanazanian*, 729 F.2d at 627. Nor does it meaningfully address the disabling effect of evidence obtained by coercive or unlawful methods. Barapind did not testify. India offered no evidentiary rebuttal to Barapind's evidence presented in open court. A case-by-case analysis of probable cause follows.

### C. Determination of Probable Cause.

#### 1. February 16, 1992 Charges F.I.R. 23

The only affidavits presented by an eye-witness to the shootout at a police roadblock near the village Rurki, at 8:30 p.m. on February 16, 1992, are those of ASI Gulzar Singh, a police officer. *See Aff. of Gulzar Singh, Annexure A/1; and Aff. of Gulzar Singh, Annexure A/6.* The original signed photograph by which ASI Singh identified Barapind was not presented to the court. Singh's affidavit states he recognized Barapind "from earlier" and was able to see Barapind by torchlight. Singh's second photographic (first signed photo) identification of Barapind in the

---

9. It is also arguable whether Barapind's evidence is recantation evidence. In half of the recantations, the witnesses state that they were forced to sign or to place their thumbprints on blank sheets of paper. *See Aff. of Rattan Singh, Def. Ex. 8, Aff. of Makhan Ram, Def. Ex. 10, Aff. of Ramesh Kumar, Def. Ex. 18.* In others, the deponents state that the police simply inserted Barapind's name in the statements when they could not identify the perpetrators of the crimes. *See Aff. of Jaswin-* der Singh, Def. Ex. 6, Aff. of Kulwant Singh, Def. Ex. 11, Aff. of Nirmal Singh, Def. Ex. 13. In a number of cases, the did not know they had implicated Barapind. A recantation is defined as: "To withdraw or renounce (prior statements or testimony) formally or publically." *Blacks Law Dictionary* 1274 (7th ed.1999). Whether the issue is one of evidence fabrication rather than recantation, the inquiry into the reliability of India's evidence cannot be ignored.

supplement to the Annexure *(Statement of Gulzar Singh, Govt. Ex. 4 (original photograph))*, along with his initial account of the shootout (Annexure A/1) are sufficient to establish probable cause. Barapind presents no evidence to explain away or obliterate ASI Singh's affidavits and identification. This is facially competent evidence sufficient to establish probable cause to believe Barapind is a perpetrator of the charged crimes. There is no pinpoint, specific information that Gulzar Singh has fabricated the Rurki incident or his identification of Barapind.

### 2. *June 29, 1991 Charges F.I.R. 52*

These murder charges rest entirely on the original and supplemental affidavits of Rajinder Kaur, whose husband and father-in-law were murdered June 29, 1991. *See Aff. of Rajinder Kaur, Annexure B/1; Aff. of Rajinder Kaur, Annexure B/7; Statement of Rajinder Kaur, Annexure B/11; and Statement of Rajinder Kaur, Govt. Ex. 4 (original photograph)*. No original signed photograph by which Rajinder Kaur identified Barapind was provided to the court. Kaur's second photographic identification of Barapind in the supplement to the Annexure *(Statement of Rajinder Kaur, Govt. Ex. 4 (original photograph))*, along with her initial account of the shootout (Annexure B/1) are facially sufficient to establish probable cause to believe Barapind was a perpetrator of the murders.

Barapind presents an authenticated, certified court transcript which establishes that Mrs. Kaur testified under oath in an Indian court during the 1997 trial of one of Barapind's co-accused in the shootings, despite her contrary prior statement around June 29, 1991, to the police, she never identified Barapind or other perpetrators in the death of her husband or father-in-law. *See Def. Ex. 7.* Mrs. Kaur's in-court testimony, under oath, is corroborated by the January 23, 2001, affidavit of her brother-in-law, Jaswinder Singh, obtained by Barapind's attorneys. Jaswinder states under oath that he is: "deeply troubled that the police have recorded that my sister-in-law had identified two assailants as Kulvir Singh (Barapind) ... and Ranjit Singh" because "I was present when the complaint was recorded and at that time, my sister-in-law did not ... identify any of the assailants." *Aff. of Jaswinder Singh, Def. Ex. 6.* Presumably this is offered as "explanatory" evidence bearing on Rajinder's initial identification.

Rajinder Kaur's 1997 testimony under oath in an Indian court subject to the protections of the Indian legal system, totally recants her original identification. It is followed by an out-of-court 1998 apparent re-identification, recanting her 1997 court testimony, presented without any explanation by Rajinder why she recants her prior in-court inability to identify Barapind or the assailants. No description is provided of the circumstances under which she gave the 1998 recantation. Her 1997 court testimony is corroborated and explained by her brother-in-law's 2001 sworn statement that she did not identify Barapind to police, nor did Jaswinder.

It is unlikely that Jaswinder, whose father and brother were allegedly murdered by Barapind would lie about Rajinder's failure to identify Barapind as the perpetrator, if Barapind killed them. *See Eain* 641 F.2d at 511–12 (statements made in open court were deemed more reliable than statements to a private attorney); *Sandhu,* 1997 WL 277394 at *8 ("where a court in the requesting country has rejected evidence that is now offered in support of probable cause, the extradition magistrate may discount it."); *Gill v. Imundi,* 747 F.Supp. 1028, 1044 (S.D.N.Y.1990) (determination by Indian court that confes-

sion was involuntary and untrue not irrelevant in extradition). See also *Samuels v. Mann*, 13 F.3d 522 (2d Cir.1993) (prior out-of-court identification deemed more reliable than in-court identification); *United States v. Owens*, 484 U.S. 554, 108 S.Ct. 838, 98 L.Ed.2d 951 (1988).

The matter is further complicated. Rajinder's supplemental 1998 statement identifies Barapind by signing the reverse side of a photograph in 1998. This is a retraction by Mrs. Kaur of her 1997 in-court recantation of her initial, 1991, alleged identification of Barapind's photo, Annex. B/6, B/7. Rajinder Kaur's court testimony under oath, presumably subjects her to a charge of perjury in India, if false. India suggests she has been improperly influenced. If true, her 1997 testimony obliterates the original 1991 affidavit to police and casts doubt on her 1998 statement, which in no way refers to or explains her sworn trial testimony. *Cf. Moghadam*, 617 F.Supp. at 779–83 (Court held that recantation had the greatest indicia of reliability even though the witness subsequently withdrew her recantation).

Rajinder Kaur's in-court testimony completely negates the persuasive value of her 1991 statement and original identification implicating Barapind. Her 1998 statement, which re-identifies Barapind, contains no explanation why she changed her opinion and identification, nor any description of the circumstances under which she gave the 1998 statement. The 1997 recantation made under oath, in open court during a trial in India, contrasted with the 1998 declaration which is an unsworn, although it purports to be an accurate, statement, sufficiently calls into doubt the competence of her identifications to make the totality of India's evidence insufficient to establish probable cause. This analysis is valid even without considering the 2001 corroborating statement of her brother-in-law. The difference in Rajinder Kaur's 1991 and 1998 statements to the police and sworn trial testimony is sufficient to obliterate probable cause. On the present state of the record, the 1998 re-identifying statements are not explained. The totality of the evidence is too unreliable to treat as competent Rajinder's identification to create a reasonable suspicion to establish probable cause to link Barapind to the two murders in Mrs. Kaur's residence in Rurki Khurd Village.

### D. October 5, 1991 Charges Case No. F.I.R. 87

This charge rests entirely on the affidavits and statements of Rattan Singh, a passenger in a vehicle en route from Barapind Village to a religious ceremony at a residence in Ahaden, Hoshiarpur District on October 5, 1991. *See Aff. of Rattan Singh, Annexure C/1; Affidavit of Rattan Singh, Annexure C/7; Statement of Rattan Singh, Annexure C/11; and Statement of Rattan Singh, Govt. Ex. 4 (original photograph)*. The original signed photograph by which Rattan Singh identifies Barapind was not submitted to the court. The second 1998 photographic thumbprinted [10] identification of Barapind in the supplement to the Annexure *(Statement of Rattan Singh, Govt. Ex. 4 (original photograph))*, along with his initial account of the shootout (Annexure C/1) is sufficient to establish probable cause.

However, in the January 18, 2001, sworn, notarized, and certified translated affidavit of Rattan Singh introduced by Barapind; Rattan Singh states that he "was unable to give [the police] the names

---

10. There is no authenticating expert opinion to identify the thumb print. Rather, an illegible signature accompanies the state that the thumb print was affixed to the 1998 statement in the presence of the unidentified signer, ostensibly a notary, Vijay Bhusham Mehta.

of the assailants because I did not know or recognize any of them." *See Aff. of Rattan Singh, Def. Ex. 8.* Rattan Singh's recantation affidavit wholly contradicts the Government's identifying affidavits. The Government does not provide any other corroborating evidence. *Cf. Orellana,* 2001 WL 266073 at *6 (corroborating evidence made original statements more reliable than recantations) *with Linson,* 88 F.Supp.2d at 1128 (even with corroborating evidence recantations were more reliable than original statements).

In his 2001 affidavit, Rattan Singh states under oath that in 1998 he was taken to the police station at Phillaur, was threatened, forcibly required to place his thumbprint on a number of blank sheets of paper; and that F.I.R. 87 and his May 18, 1998, affidavit were read to him in Punjabi. Rattan denies that Barapind, who he has known since Barapind was a child, was involved in the October 5, 1991, killings of Ram Tirath, Tarlochan Singh, and Jaspal Singh. He now testifies that in 1991 approximately one-half hour after the killings, he told police everything he knew that had happened and was unable to give the names of the assailants because he did not know or recognize any of them. Rattan now states that the police reports which attribute his identification of Barapind as an assailant in the October 5, 1991, killings are false statements. He asserts that the police misused his involuntary and forcibly-taken thumb print.

The 2001 declaration of Rattan Singh, if believed, denies he identified Kulbir Singh as a perpetrator in the F.I.R. 87 and that he was coerced into supplementing his identification. There is no other evidence corroborating Barapind's participation in those crimes. The 2001 affidavit, if believed, raises doubt about the trustworthiness of his 1998 affidavit, which Rattan claims was involuntarily obtained by police

who took his thumbprint under threat of death at Phillaur.

The following facts bearing on the credibility of the Rattan Singh 2001 affidavit obtained by Barapind's attorneys, are established by a preponderance of the evidence. Rattan Singh has known Barapind since childhood. He does not explain any other relationship with Barapind or whether he supports the Khalistan movement and Sikh independence, making difficult an assessment of bias. Rattan Singh has never been identified as a suspect in the case and has no apparent self-serving motive to misrepresent the identities of the participants in the killings. If Rattan Singh was taken involuntarily to the police station at Phillaur in 1998, his life threatened, and his thumbprints forcibly taken, he has good cause to believe that testimony contrary to the case of the Government of India, exposes him to risk of arrest, reprisal, and serious consequences in the Country of India. India does not rebut Rattan's new testimony about the 1998 coercion. It is questionable whether Rattan would give a false 2001 recantation of prior identifications of Barapind, which may subject him to criminal consequences or physical reprisal in India, where he presently resides. Rattan has certainly incurred the disfavor of the Indian police by submitting his recent affidavit.

India elected not to question Rattan Singh under oath, instead it chose to rely on its position no discovery is permitted in extradition proceedings even if coercion or other wrongful means of obtaining evidence are claimed. India strenuously argues there is no right to discovery in extradition proceedings and the same result would pertain under the laws of the United States, if this evidence were presented in an American court, because such an attack would not be raised until later in the proceedings when a judicial determination

would be made as to the reliability, credibility, and admissibility of the identifications. By inference India argues Barapind will have the same opportunity in an Indian court after he is extradited. In this country, if the Rattan Singh recantations are found true in a pretrial suppression hearing, no trial would occur because no other evidence supports the charges against Barapind.

Although contradictory evidence is not to be considered, the extradition judge makes credibility determinations as to the competence of the evidence supporting probable cause. Barapind has submitted unrebutted evidence that the Indian police and their agents sometimes used false identifications, false encounter killings, extra-judicial detentions, torture, and coercive methods in their efforts to suppress militant Sikh separatists. It is unlikely that Rattan Singh would expose himself to the risks of criminal prosecution and reprisal by police in his country, India, by giving a "false" affidavit in 2001, declaring he never identified Barapind or anybody else, because he could not do so, much less "falsely state" he was forced under threat of death to provide his thumb print for the Barapind identifications, knowing his 2001 affidavit would be provided to the Indian government. Rattan has a bias against India because he has suffered at the hands of the police. On the totality of the circumstances, the January 13, 2001, affidavit of Rattan Singh is credible. It destroys the competence of the evidence and obliterates probable cause for F.I.R. 87.

India had the opportunity to challenge the explanatory (of the circumstances of the taking of the 1998 identification from Rattan Singh) and his obliterating 2001 affidavit. It chose not to do so. The

consequence of this election is a failure of proof on the issue of credibility and the competence of the evidence underlying F.I.R. 87.[11]

### E. September 6, 1992 Charges Case No. F.I.R. 89

The only affidavits and statements presented by eye-witnesses to the September 6, 1992, shootout at the Sohan Singh residence in Tarkhan Majera, are those of Sohan Singh and his wife Gurmail Kaur. *See Aff. of Sohan Singh, Annexure D/1; Aff. of Sohan Singh, Annexure D/7; Statement of Gurmail Kaur, Annexure D/11; and Statement of Sohan Singh, Govt. Ex. 4 (original photograph).* The original signed photograph by which Sohan Singh identifies Barapind was not provided the court. Sohan's second verified photographic identification of Barapind in the supplement to the Annexure *(Statement of Sohan Singh, Govt. Ex. 4 (original photograph)),* along with his initial account of the shootout (Annexure D/1) are sufficient to establish probable cause.

Barapind presents several affidavits to show that the three slain brothers were police collaborators. There is no evidence Kulwant Kaur, the wife of Karamjit Singh, who was shot and killed, was a police collaborator. Even accepting *arguendo,* these affidavits are true, Barapind does not explain away or obliterate the Government's evidence that Kulwant, an innocent civilian, was murdered. Instead, Barapind's voluminous submissions bear on justification and revenge motive for the killings of the three brothers, who were "thugs" and police collaborators. Barapind offers no evidence surrounding the circumstances of the killings that suggests he acted in self-defense or that legal neces-

---

11. There may be inherent inconsistency in an extradition judge's credibility findings, when the law prohibits consideration of contradic-

tory evidence or evidence that establishes an affirmative defense; however, there is no other way to determine "credibility" of a witness.

sity required the killing of Kulwant. Even if such facts existed, they would raise defenses to the charges, evidence of which is inadmissible in extradition. Probable cause exists to believe Barapind was a co-perpetrator of the crimes of murder charged in F.I.R. 89 and the accompanying Challan.

## F. *October 26, 1991 Charges F.I.R. 100*

These charges are based on the affidavits and statements of Makhan Ram and Kulwant Singh. *See Aff. of Makhan Ram, Annexure E/1; Affidavit of Makhan Ram, Annexure E/7; Statement of Makhan Ram, Annexure E/12; and Statement of Makhan Ram, Govt. Ex. 4 (original photograph).* No original signed photograph by which Makhan Ram identifies Barapind was presented to the court. Ram's second photographic identification of Barapind in the supplement to the Annexure *(Statement of Rattan Singh, Govt. Ex. 4 (original photograph))*, along with his initial account of the shootout (Annexure E/1), would ordinarily be sufficient to establish probable cause.

Barapind offers a sworn, notarized, and duly authenticated January 13, 2001, affidavit of Makhan Ram in which Makhan Ram denies ever having made a statement implicating Barapind or having seen him at the scene of the attack on Makhan and Sahib Singh Sahbi October 26, 1991, when Makhan was shot twice and wounded and Sahbi was shot and killed. *See Aff. of Makhan Ram, Def. Ex. 10.* When shown the Government's evidence of his statement implicating Barapind, Makhan Ram describes it as a falsification. *Id.* Makhan goes on to state in his January 13, 2001, declaration that in addition to F.I.R. 100, two police-prepared affidavits were read to him in Punjabi. Makhan denies ever having made the statements attributed to him, which he describes as "fabricated lies."

Makhan further testifies that the police forced him to sign blank papers.

It is undisputed that Makhan gave his original statement to police from Phillaur at the hospital about one and one-half hours after he was taken there following the shooting at the Phillaur railway crossing. Makhan states he was falsely accused by police in September of 1997 in a case relating to "poppies" (opium), which resulted in his exoneration. While he was in custody in connection with the drug case, Makhan states the Phillaur police forced him to sign blank sheets of paper before a magistrate. Makhan now states that these two involuntary signatures were used to prepare "two false affidavits" which purport to identify the men who shot him on October 26, 1991, as Kulbir Singh, resident of Barapind, and Gurdeep Singh, resident of Hera.

The circumstances under which the January 13, 2001, affidavit of Makhan were taken are not described by Barapind, nor are facts provided about Makhan's background or political views to enable evaluation of his motives and possible bias associated with his 2001 affidavit. Makhan states he was falsely accused and acquitted of drug charges in September of 1997. This provides motive to testify adversely to and potential bias against India. Makhan's 2001 recantation is conflicting and inconsistent with his earlier alleged statements of October 26, 1991, and his verified affidavit of June 9, 1993. It also subjects him to risk of reprisal from the Indian government. A supplemental affidavit of Makhan Ram dated May 20, 1998, is a verified identification of Kulbir Singh as the perpetrator of the murder of "Sahib Singh." Under all the circumstances, the credibility of Makhan Ram's recantation cannot be determined without a trial.

Barapind submits the affidavit of Kulwant Singh, obtained by Barapind on Jan-

uary 13, 2001, in which Kulwant states that he is a farmer who lives with his family in the village of Mathinda Kahurad. Kulwant's January 13, 2001, Tab H, affidavit, states that police from Phillaur came to his home "one week later" to obtain an affidavit, because Kulwant was listed as a witness in F.I.R. 100, concerning the October 26, 1991, incident. Kulwant now testifies that the police told him they had his recorded statement of December 8, 1991, stating that he suspected the two youths who killed "Sahib Singh Sahbi," resident of "Dhaka," Colony, were Kulbir Singh of Barapind and Gurdeep Singh of "Hera."

Kulwant now asserts he never gave any such statement to the police in 1991 and has refused to give an affidavit to police because he never made such a prior statement. Kulwant testifies he did not know Kulbir Singh of Barapind or Gurdeep Singh of Hera and, consequently, it was not possible for him to identify them. Kulwant Singh is listed in India's Annexure E at page 1.78 as witness number 4. No other information is furnished by India or Barapind as to the background or circumstances of Kulwant Singh's observation of, knowledge, or association with relator or any of the events of October 26, 1991. The Inderjit Singh affidavit, Annex. E/2, asserts Kulwant Singh gave his original identifying statement to Inderjit on December 8, 1991. Without a trial it is impossible to resolve the credibility dispute between Kulwant's new 2001 affidavit and the alleged identification he made in 1991. There is no statement of Kulwant in the Annexure E submitted with F.I.R. 100. If Kulwant's present affidavit is true it negates his alleged prior identification of Barapind of December 8, 1991, leaving only the disputed Makhan Ram original, 10/26/01, identification of Barapind.

The third affidavit concerning the Sahbi killing and attack on Makhan Ram is from A.S.I. Inderjit Singh, Jalandhar, on October 26, 1991, Annex. E/2, that he recovered bloodstained earth and empty shells from the crime scene along with the clothes of Sahib Singh aka Sahbi, deceased. Inderjit states that on December 8, 1991, Inderjit took and recorded the statement of Kulwant Singh, resident of Mathinda Khurd, in which Kulwant identified Kulbir Singh of Barapind and Gurdeep Singh aka Deepa, resident of Herian, as perpetrators. Inderjit does not himself claim to be a witness to the shooting.

The evidentiary dispute over the motives, bias, and totality of circumstances surrounding original statements of Makhan Ram and Kulwant Singh, alleged recantations, actual recantations, and coercive conditions under which the recantations were taken, cannot be resolved in this extradition proceeding. Although substantial doubt is created by the contradictory affidavits of Makhan Ram and Kulwant Singh, the competence of India's probable cause evidence requires a trial to resolve the existing material credibility disputes. Probable cause is not defeated under these circumstances.

G. *October 31, 1992 Charges Case No. F.I.R. 113*

The Government presents affidavits and statements of three eye-witnesses to the killings of October 31, 1992, in an encounter along the Banga Road between Lasara and Apra, when Barapind and others allegedly opened fire on a police party riding in a Gypsy vehicle. *See Aff. of Rajinder Singh, Annexure F/1; Statement of Balwinder Singh, Annexure F/10; Statement of Sukhpal Singh, Annexure F/11; and Statement of Balwinder Singh, Govt. Ex. 4 (original photograph).* The original signed photograph through which ASI Balwinder Singh identifies Barapind was not submitted. Balwinder's second verified

photographic identification of Barapind, the 1998 supplement to the Annexure (*Statement of Balwinder Singh, Govt. Ex. 4 (original photograph)*), along with his and SI Rajinder Singh's initial accounts of the shootout (Annexures F/1 and F/11) are sufficient to establish probable cause.

Barapind offers an affidavit from Paramjit Singh, who was charged in connection with the shootout on October 31, 1992, and subsequently acquitted. *See Aff. of Paramjit Singh, Def. Ex. 12.* However, this affidavit, although contradictory in its denial that Barapind participated in the October 31, 1992, attack, does not explain away or obliterate the Government's evidence tying Barapind to the shootings. It provides a contradictory version of the facts. Other than to suggest that no evidence submitted by India should be trusted, no evidence sufficient to defeat probable cause has been submitted by relator for this charge. Probable cause exists to believe Barapind participated in the shootings identified in F.I.R. 113.

### H. *November 1, 1992 Charges Case No. F.I.R. 114*

The Government presents affidavits and statements of three eye-witnesses relating to the events of November 1, 1992, at the residence of Paramjit Singh, Village of Khar Singh Puri Phillaur, where constables Jagtar Singh and Bhagwant Singh were killed: i.e., ASI Balwinder Singh, HC Rajinder Singh, and Makhan Singh. *See Aff. of Balwinder Singh, Annexure G/1; Affidavit of Balwinder Singh, Annexure G/6; Challan, Annexure G/8; Statement of Rajinder Singh, Annexure G/10; and Statement of Balwinder Singh, Govt. Ex. 4 (original photograph).* The original signed photograph, by which ASI Balwinder identifies Barapind, was not provided to the court. ASI Balwinder's second photographic identification of Barapind in

the supplement to the Annexure (*Statement of Balwinder Singh, Govt. Ex. 4 (original photograph)* ), along with his and HC Rajinder Singh's initial accounts of the shootout (Annexures G/1 and G/10) are sufficient to establish probable cause that Barapind participated in the shootings.

Barapind offers the February 1, 2001, notarized affidavit of Paramjit Singh, who is the managing director of the Evershine public school, whose residence was forcibly entered, and searched over his objection November 1, 1992, after a firefight in fields behind his residence. Paramjit states he was illegally detained and severely tortured until November 9, when he was taken to court and "falsely" charged in cases F.I.R. 113 and 114. *See Aff. of Paramjit Singh, Def. Ex. 12.*

Paramjit's affidavit presents a contradictory version of the events from those presented by India in its affidavits and statements. For example, Paramjit discusses a shootout that occurred at 4:00 a.m. on November 1, 1992, in the fields behind his house, which India's affidavits do not acknowledge even occurred. Paramjit does not discuss the shootout that occurred in his house on the early morning of November 1, 1992, which resulted in the death of Constable Jagtar Singh and wounding of Constable Bhagwant Singh, which forms the basis for these charges. Although Paramjit affirmatively states that Barapind was not involved (he does not affirmatively state the basis for his recognition of Barapind) in the shootout that occurred in the fields behind his house at 4:00 a.m. on November 1, 1992, (he states the suspects were "unknown"), his affidavit does not absolve Barapind from the later (5:15 a.m.) shootout inside Paramjit's house. Paramjit also testifies that no one was injured in the firefight behind his residence. Paramjit's affidavit contradicts, rather than explains away or obliterates, the Govern-

ment's evidence tying Barapind to the shootout at Paramjit's house. A material conflict is presented in which motive, bias, and credibility of the witnesses must be decided, such disputed facts can only be revolved by a trial. There is probable cause to believe Barapind should stand trial for the charges in F.I.R. 114.

I. *June 1, 1991 Charges Case No. F.I.R. 94*

The sole affidavits presented by an eyewitness to the shootout at a market area at Sanri, Jalandhar District, are those of Officer Gorkha. *See Aff. of SPO Gorkha, Annexure H/1; and Aff. of SPO Gorkha, Annexure H/7.* Not only was the original signed photograph by which Officer Gorkha identified Barapind not presented, but there is no second, backup verified photographic identification of Barapind in a supplement to the Annexure. However, Barapind presents no evidence at all to explain away or obliterate the Government's evidence, except a 2001 affidavit from a witness who lives in Khan Singh Pari, which states that there were no lights near the bus stop when the attack occurred that would permit eye-witness identification. This affidavit does not provide sufficient detail of the scene the night of June 1, 1991, to determine whether the identification could have been made as related by Officer Gorkha. Officer Gorkha's affidavits cannot be so-contradicted and are competent to establish probable cause, because he states he personally witnessed the shooting and makes his identification based on his recognition of Barapind. There is no evidence to the contrary that provides a reason to question Officer Gorkha's identification, or that obliterates probable cause.

J. *November 4, 1991 Charges Case No. F.I.R. 93*

The only affidavits presented by an eyewitness to the November 4, 1991, shootout near the canal bridge on the road to Jandiala, are those of Harjinder Singh, son of the murdered ex-MLA, Sarwan Singh Cheema. *See Aff. of Harjinder Singh, Annexure J/1; and Aff. of Harjinder Singh, Annexure J/6.* The original signed photograph by which Harjinder positively identifies Barapind was not presented to the court. Harjinder's second verified photographic identification of Barapind in the supplement to the Annexure *(Statement of Harjinder Singh, Govt. Ex. 4 (original photograph)),* along with his initial account of the shootout (Annexure J/1) is sufficient to establish probable cause.

Barapind presents evidence to show that Sarwan Singh Cheema was a Communist and an enemy of the Khalistan movement. Girpal Singh Sanra testified his son, Balwant, who was a Sikh militant, was killed on November 18, 1989, by Cheema's gunman. His testimony was not based on personal knowledge. Such evidence offers a motive for an attack on Cheema by Sikh militants, and establishes a motive why Sikh militants would retaliate against Cheema, but does not explain away or obliterate the Government's evidence. There is competent evidence to establish probable cause to link Barapind to this charge.

K. *April 26, 1992 Charges Case No. F.I.R. 34*

The government presents no affidavits of any eye-witnesses to the April 26, 1992, shootout at Cheema Kalan. Instead, it refers to a secret informant and presents an affidavit of SI Surinder Pal, who states he took a statement from an eye-witness, Nirmal Singh. *See Aff. of Surinder Pal, Annexure K/1; and Aff. of Surinder Pal, Annexure K/5.* A statement of Nirmal Singh is described in the FIR. *See FIR no.*

*34, Annexure K/6.* There is no affidavit by which an eye-witness purports to identify Barapind through a photograph. Instead the Government presents an affidavit of SI Surinder Pal who identifies Barapind through a photograph. Pal did not witness the crimes. *See Aff. of Surinder Pal, Annexure K/1.* Such evidence is not based on personal knowledge and is second-level hearsay that purports to report Nirmal's alleged identification of Barapind. This may be sufficient for probable cause. *See Mainero,* 164 F.3d at 1206, citing *Emami,* 834 F.2d at 1451 (foreign prosecutor's affidavit with summaries of statement admissible) and *Zanazanian,* 729 F.2d at 626–27 (police reports containing multiple hearsay sufficiently reliable to be competent).

The evidence Barapind presents, the January 17, 2001, affidavit of Nirmal, contradicts the Government's evidence. Nirmal states he has lived in Dubai since 1977 and only makes periodic visits to India. His residence in Dubai was discussed in his original affidavit, but he acknowledges he returned periodically to visit his wife and in-law. He claims he does not know any of the young men in the area and could not and did not identify Barapind as one of the assailants. *See Aff. of Nirmal Singh, Def. Ex. 13.* Hearsay statements are admissible in extradition hearings (*see Zanazanian,* 729 F.2d at 627).

Although a sworn, notarized, authenticated affidavit of Nirmal Singh that Barapind offers may be facially more reliable than the affidavit and hearsay account of Officer Surinder Pal. No background is presented to permit evaluation of Nirmal's current bias or motives or the circumstances under which he gave his January 17, 2001, affidavit. Nor is there information about the circumstances under which Surinder Pal came to identify Nirmal as an alleged eye-witness, or when, where, or under what circumstances the alleged original identification by Nirmal was made in 1992. There is a total absence of evidence by which to evaluate the efficacy of the eye-witness identification by Nirmal, provided to the court through the conclusory statement of Surinder Pal.

Although credibility determinations are to be made by the extradition judge, the evidence submitted does not permit such a credibility decision to be made about the allegedly obliterating 2001 affidavit of Nirmal without further evidence and a hearing. Even though Nirmal's new affidavit conflicts with SI Pal's hearsay report of Nirmal's 1992 alleged statement and identification of Barapind, other than the general evidence that Indian police have fabricated charges, there is no specific direct evidence that Pal fabricated Nirmal's 1992 statement and Nirmal's identification of Barapind. Ultimately, a trial is required to resolve these evidentiary conflicts and decide who is telling the truth. This charge is not obliterated or explained away.

L. *October 13, 1992 Charges Case No. F.I.R. 220*

The evidence linking Barapind to the killings of Darshan Singh Kaypee and his armed escorts on October 13, 1992, near the Deep property, Jalandhar, is tenuous. There is no affidavit from any eye-witness that identifies Barapind as a perpetrator in the incident. The only basis to implicate Barapind is the confession of his alleged accomplice Tarlochan Singh, who was killed in a "cross-fire" during what the Punjab Police describe as a "rescue attempt." The second item of evidence is an undated affidavit of gunman Romesh Kumar that identifies a photograph of Barapind, but does not say Barapind was a perpetrator in the Kaypee killing or that the affiant identified Barapind as a shooter.

Barapind submits three affidavits from Narinder Singh, Om Prakash and Resham Singh, that detail their observations how Tarlochan Singh was tortured while in police custody. As the First Circuit notes, "[a]ll evidence does not have the same importance even if it is authentic and admissible. For example, a confession obtained by duress is inherently unreliable and would be given little weight even if the confession were authenticated." *U.S. v. Kin–Hong*, 110 F.3d 103, 121 (1st Cir. 1997); *see Gill v. Imundi*, 747 F.Supp. 1028, 1042–47 (S.D.N.Y.1990). Other courts in the Ninth Circuit that have been presented evidence extracted through torture, have determined probable cause, excluding such evidence. *See Cornejo–Barreto v. Seifert*, 218 F.3d 1004, 1008 (9th Cir.2000); and *Mainero v. Gregg*, 164 F.3d 1199, 1207 (9th Cir.1999). Narinder Singh's January 13, 2001 affidavit states he is the son of Tarlochan, that he was present when and observed that Tarlochan was tortured by Indian police, and was himself then beaten.

Om Prakash's January 13, 2001, affidavit states he is the mayor of the Village; he is Hindu, not Sikh, and observed Tarlochan after the second torture. Resham Singh's January 13, 2001, affidavit declares he also observed Tarlochan in critical condition after release by the Indian police before Tarlochan was killed in an alleged false encounter. Ramesh Kumar, a former gunman for Kaypee, in a January 30, 2001, affidavit, denies he identified Barapind as a shooter in the Kaypee killings. Ramesh also claims he was coerced to sign blank papers, which apparently were not used by India. This results in the obliteration of probable cause in case number F.I.R. 220 and raise question about the trustworthiness of India's original evidence. India's only evidence for F.I.R. 220 is Tarlochan Singh's confession allegedly identifying Barapind as an accomplice, which accord-

ing to three sworn witnesses was extracted through torture, and is otherwise uncorroborated. Probable cause cannot be based on evidence procured by torture, which is incompetent if obtained by unlawful means. India does not rebut the evidence of Tarlochan's torture.

Testimonial evidence was received in open court from Simranjit Singh Mann and Navkiran Singh, that torture, reprisal police killings of insurgents in "false encounters," and anti-terrorist tactics that included extra-judicial detentions without cause, which violated fundamental civil liberties (prolonged unjustified incarceration), were regularly practiced by Indian Security forces and local police in Punjab.

The evidence of Ramesh Kumar does not per se recant his earlier affidavit, because although Ramesh identified Barapind, he did not name Barapind as a perpetrator. A credibility determination can be made that evidence procured by the torture of Tarlochan is not competent. India offers no contrary evidence. It is more probably true than not true that Tarlochan was tortured (see also post-mortem report), that his identification of Barapind was involuntarily obtained in violation of universally recognized human rights, and should be excluded from the probable cause determination. There is no other evidence linking Barapind to these killings and an absence of probable cause for the charges in F.I.R. 220.

## VII. ANALYSIS OF POLITICAL OFFENSE EXCEPTION

India contends the evidence is insufficient to establish a political uprising and even if, *arguendo*, there was a political uprising, the evidence does not establish a political purpose for Barapind's crimes. On cross-examination, Dr. Mahmood acknowledged that Sikh militants generally

targeted members of security forces, pro-government vigilantes, and representatives of the Indian government. She could not opine whether the murders of civilians or former government ministers or officials were acts in furtherance of the Sikh militant insurgency. Although Dr. Mahmood recognized that killing of members of Indian security forces and other government agents may be political acts, such killings are not presumptively political. Killing a law enforcement officer for revenge, or to obtain weapons, is not political. Acts of revenge and vigilante justice are not protected under the political offense exception. Crimes directed at non-combatants or former government officials, who lack a contemporaneous connection to the government or opposition to the uprising are not political offenses. Barapind's defense he is a non-violent political dissident, persecuted by India, against whom all charges have been improperly fabricated, is not necessarily inconsistent with the political offense defense. Each offense must be separately analyzed to determine if it is a political offense.

 Barapind has submitted evidence of the nature of the Khalistan movement, Sikh separatists' quest for independence, and militant Sikh activities. The testimony of MP Mann establishes that he and other non-violent Sikh political leaders were imprisoned, tried for political crimes, and tortured by reason of their advocacy of an independent state for Sikhs. Although arrested 56 times and formally charged in 16 cases, Mann has never been convicted. The analysis turns on case specific evidence, F.I.R.–by–F.I.R. to demonstrate how each crime is political and incidental to the claimed uprising.

## A. The Uprising Component

### 1. Spatial Requirement

The spatial requirements of the "uprising" prong are satisfied. The turmoil in the Punjab during the 1980s and early 1990s involved Sikhs rising-up in their own land, the State of Punjab, against the national government of that land, India. Though Sikh militants also carried out attacks in neighboring states, the Punjab, where most Sikhs reside, was the locale of the vast majority of the violence and all of the crimes in this case.

### 2. Political Nature of the Strife

Although a great many of the victims of the Sikh militants were Sikhs themselves, this does not make the armed conflict less an uprising. Despite religious underpinnings of the Khalistan movement based on Sikhism, it was fundamentally a political struggle waged by Sikh militants who sought to establish Khalistan as a separate political state, which would be independent of India. Any person who opposed this political objective, Hindu or Sikh, was an enemy of the Sikh separatist movement. The militant Sikhs were people rising up in their own land, Punjab, India, against the government of that land, India.

India enacted the Terrorist and Disruptive Activities (Prevention) Act (TADA) to fight terrorism in Punjab:

> The Terrorist and Disruptive Activities (Prevention) Act (TADA), though enacted to fight terrorism in Punjab, is applicable in all states ... On August 12, Parliament voted to extend the Act for an additional two years. The law was promulgated to punish those found guilty of terrorist and disruptive acts with no less than five years imprisonment and up to the death penalty for certain terrorist crimes. *Disruptive activities include speech or actions that disrupt or challenge the sovereignty or territorial integrity of India.*

*Country Reports on Human Rights Practices for 1991, U.S. Dept. of State, at p.*

*1394.* The italicized language of TADA demonstrates that this law had the political purpose of suppressing "speech or actions" that "disrupt or challenge the sovereignty or territorial integrity of India." In the same report at p. 1389, "in Punjab, militant Sikh organizations targeted civil servants, political candidates, journalists, presumed government informers, and police officials (and their families), and undertook random killings against public figures. The nine principal militant groups claimed their terrorist activities were part of the struggle for an independent Sikh State (Khalistan).'" In 1991 twenty-three candidates for state and national office in Punjab were killed by Sikh militants during the spring election campaign. *Id.* at 1389.

That the Khalistan movement was political in nature, is further evidenced by Rajiv Gandhi's attempt to broker a peace with moderate Sikhs in 1985 to address the concerns of those advocating independence, followed by Beant Singh's election in 1992 on a platform to eradicate the Khalistan movement.

If as the government argues, the "uprising" prong requires "on-going," organized battles between contending armies. *Eain,* 641 F.2d at 519–20, such evidence has not been submitted. Dr. Mahmood recounted the establishment of the Sikh Khalistan Commando Force, which splintered into guerrilla groups. These were not organized armies, but they were armed paramilitary groups "waging war" on India. The Khalistan Commando Force is a military force that is a recognized enemy of the country of India. The Khalistan political struggle did involve thousands of Sikh militants who used violent means in a revolt to change the government of India's control of the Punjab state, to effect the secession of a separate Sikh state. The evidence preponderates that the Sikh sep-

aratist Khalistan movement was a struggle for political power over establishment of a Sikh state that amounts to an "uprising." The evidence equally establishes that many Sikh leaders were non-violent and eschewed violence as a means of establishing the State of Khalistan. (See Mann and Navrikan Singh testimony.)

### 3. *Temporal Requirement*

The temporal requirement of the "uprising" prong is also met since the early 1990s ('90–'92), when all of Barapind's alleged crimes occurred, was the highest period of militancy and armed conflict with casualties on all sides. *See Dep. of Dr. Cynthia Mahmood, 49:19–22.* "It was also the highest period of the counterinsurgency in terms of numbers of disappearances, numbers of extra-judicial executions, episodes of torture, and certainly was the peak of refugee flows towards the West." *See Dep. of Dr. Cynthia Mahmood, 49:22–50:1.* Barapind's alleged crimes temporally coincide with the period of highest intensity of the violent resistance by Sikh separatists.

### 4. *Level of Violence*

India argues the level of violence was de minimis in a country as populous as India. It contrasts the relative number of deaths in Northern Ireland as a percent of total population to the 30,000 to 100,000 deaths in the Punjab as a percent of 28 million total state population in a nation of one billion persons. Even if casualty figures are over-stated because there is no differentiation between ordinary crimes and crimes committed in furtherance of the Khalistan movement, the casualty figures only include published deaths and do not include people who disappeared but in fact were killed in "encounters," or who were believed to be in police custody but were dead. Viable estimates for the total num-

ber of casualties suffered on all sides during the militancy period range from 30,000 to 100,000. *See Dep. of Dr. Cynthia Mahmood, 13:3–13:9.* By contrast, the uprising in Northern Ireland over the past three decades claimed some 3,500 lives. *See Chris Thornton, A Landmark for What?,* TIME, June 25, 2001 Vol. 157 No. 25, at http://www.time .com/time/europe/eu/ magazine/0,9868, 131047,00.html. That India is a populous nation does not make de minimis 30,000 to 100,000 deaths in the Sikh separatist conflict with India.

With respect to the size of the contending forces, the number of Indian security forces stationed in the Punjab to quell militants' violence totaled half a million. *See Dep. of Dr. Cynthia Mahmood, 60:24–61:1.* On the Sikh militant side, although there is no exact figure, protagonists were in the thousands, considering that the number of militants killed by the security forces each year ran into the hundreds in the late 1980s and over a thousand a year in the early 1990s. Dr. Mahmood estimates there were 3,000 to 4,000 militants. *See Govt. Post–Extradition Brief, 10:11.* The Government rejoins that relative to the total population of the Punjab, there were proportionately less Sikh militants than there were members of the Irish Republican Army (IRA). *See Govt. Post–Extradition Brief, 10:12–22.*

No bright-line standard exists that defines a relative number of insurgents to total population as a minimum formula which quantifies as an uprising. More relevant are the total number of participants engaged for the contending sides and the total number of casualties inflicted on all sides and society. Tens of thousands of deaths and casualties suffered over a decade in the Sikh separatist uprising in the Punjab State of India, advocating a Khalistan state, during the late 1980s and early 1990s meet the numerosity and political requirements to qualify as a political uprising.

### B. The "Incidental To" Component

Political motivation does not turn every crime into a political offense. *Ahmad v. Wigen,* 910 F.2d 1063, 1066 (2d Cir.1990) (attack on a commercial bus carrying civilian passengers on a regular route, not a political offense).

#### 1. Charges Relating to Attacks on the Punjab Police and other Indian Security Forces

Of the offenses where probable cause is established and for which Barapind has the burden to show by a preponderance of the evidence the offenses were committed as an incident to the political uprising, five deal, wholly or in part, with shootouts or killings of members of the Punjab police or security forces in armed attacks by Sikh militants. In considering the status of the victims, India argues that police officers should be considered civilians, not soldiers fighting the Sikh militants. Though members of the Punjab police are civilians in the sense that they are not a part of the Indian Armed Forces, they are paramilitary forces, not *non-combatant* civilians. Professor Mahmood's testimony and the U.S. State Department's *Country Reports on Human Rights Practices* establish that the Punjab police, home guard, and security forces, were active as a paramilitary force for the Indian government in fighting the Sikh militants. Such local forces were instrumental in ultimately crushing the Khalistan movement.

The Punjab police committed extra-judicial "encounter" killings and tortured Sikh militants showing their antagonism towards the Sikh separatists' and Khalistan movement's political objectives. Although extradition is not sought for TADA offenses, most of Barapind's cases include

TADA charges. TADA laws assigned criminal consequence to conduct that challenged or disrupted Indian sovereignty or territorial integrity, political imperatives. There is circumstantial evidence that India considered some F.I.R. cases which included TADA charges as politically motivated. The presence and actions of local police and security forces were to ensure that India remained in control of the Punjab. The Punjab police, Home Guard and other security force members were all highly visible state agents who sought to preserve the sovereignty of the Punjab state and India over the contested region against Sikh militants. This does not per se make them legitimate targets in the uprising. Regardless whether an officer served the Punjab Police, the Home Guard, the Border Security Force, the Paramilitary Force or the Indian army itself, in fighting the Sikh militants, there is no legal or practical reason to treat any of these combatants differently based solely on the agency by which they were employed. Each set of charges must be separately considered to determine applicability of the political offense exception.

a. *February 16, 1992 Charges (Case No. F.I.R. 23)*

These charges arise from a firefight that occurred between Barapind and his cadre, and members of the Punjab police. It is unclear from the record whether Barapind and his companions intended to attack the police picket (road block) or happened upon it by chance. Whether they fired their weapons solely out of self-defense, at an unexpected target of opportunity, or as a part of a pre-planned attack, this was a tactical paramilitary engagement between insurgents and local police or security forces engaged in suppression of militant Sikh separatists. One of India's original affidavits for F.I.R. 23, refers to prior conflict on February 16, 1992, regarding an election dispute and describes the perpetrators as "terrorists," "doing propaganda," on workers in the village. Political pamphlets, advocating boycott of upcoming elections, were found in the perpetrators' abandoned vehicle. These facts establish more likely than not that the political advocacy activities of the perpetrators and others caused a violent confrontation between armed paramilitarists of the two contending sides. The crimes were precipitated by Sikh separatist political activities which India sought to suppress. This evidence establishes the political offense exception for the charges in F.I.R. No. 23.

b. *October 31, 1992 Charges (Case No. FIR 113)*

This offense apparently arises from an incident at Chokra Ludihana District, where Barapind and an accomplice, who were fleeing from the Punjab police, engaged in a gunfight after an earlier shooting of three police by "extremists." It includes TADA charges. Whether Barapind fired at the police in order to evade capture or as part of an ambush, India's use of the term "extremists" does not per se identify the political purpose to the encounter. "Extremists" could equally refer to terrorists. Barapind and his accomplice were Sikh militants advocating a separate Khalistan state. The theft by Barapind and his accomplice of a scooter and a jeep in order to effect their escape, is part of the continuum of events that initiated with the firefight with police. Only police officers were engaged in the shooting incident. That India also charged Barapind with TADA offenses for disrupting the sovereignty and territorial integrity of India is an additional factor that makes it more likely than not that these offenses were committed incident to

and in furtherance of the Khalistan political uprising.

### c. *November 1, 1992 Charges (Case No. FIR 114)*

This offense is an extension of the October 31, 1991, charges in Case No. 113, involving the search of Paramjit Singh's residence in pursuit of the suspected extremists (terrorists) which resulted in another firefight and the shooting deaths of three constables. As the F.I.R. 113 charges have been determined to be within the political offense exception, Case No. 114 arising out of Indian security forces tracking Barapind and his confederates, described in F.I.R. No. 113 as "extremists," to a particular house, where a lethal attack occurred as law enforcement officers entered the residence. Whether the attack was committed as a planned ambush or simply to avoid capture by police forces, for the same reasons that apply to Case No. 113, Case No. 114 is incidental to the political uprising. Also incidental to the uprising is Barapind's theft of a scooter to facilitate his escape from the security forces on November 1, 1992.

### d. *June 1, 1991 Charges (Case No. F.I.R. 94)*

These charges arise from a June 1, 1991, incident where members of the Punjab Police and Punjab Home Guard were fired on by Barapind and other militants in a market area. Charges under TADA were also filed for this incident. The perpetrators retreated to fields and challenged the police to follow them. The perpetrators were yelling "Khalistan Zindabad" (free Khalistan), a political slogan, during the encounter. Since the Indian security forces, including the Punjab Police and Punjab Home Guard, were legitimate targets of the Sikh militants, and the suspects were declaring their political motive by shouting "Khalistan Zindabad." The totality of the evidence shows it more likely than not that the attack was incidental to the uprising and that the suspects were engaged in political activity. The theft of weapons and ammunition from the security forces were crimes incidental to the uprising since the militants used weapons to further their cause, while at the same time depriving the security forces of their use. The political offense exception is established for the F.I.R. No. 94 charges.

### e. *November 4, 1991 Charges (Case No. F.I.R. 193)*

These charges arise from an incident where Sarwan Singh Cheema, a former government official, and his security escort (all members of the Indian security forces), were attacked and killed by Barapind and other militants. This offense is unique in that not only were members of the Indian security forces killed, but a noncombatant civilian as well. Charges in this case were also brought under TADA. As an ex-legislator, Cheema was no longer a de jure agent of the Indian state. Although not formally a representative of the Indian government, it is reasonable to infer that as an ex-MLA, Cheema continued to have a political identity in the Punjab. Cheema's political status was also enhanced because the Punjab in 1991 was under President's Rule. Technically, at that time, the state's political figures were not active MLAs. Although it is unclear whether Cheema was the primary target or his military escort, a person in a "Government Gypsy Jeep" accompanied by five members of the Punjab police, presented a target of opportunity for Sikh militants. India argues Cheema's activities against Sikh militants more likely caused his killing to be a revenge or reprisal.

Barapind offers the testimony of Gurpal Samra, who believes Cheema was respon-

sible for the death of his son, a supporter of the Sikh militants. Samra opines that Cheema was then perceived by the Sikh community in April 1991, to be targeting Sikh militants and Cheema's status as an anti-Khalistan figure made his death a revenge killing. However, India presents no evidence, except speculation, to show that either Barapind or his accomplices were motivated to take personal revenge against Cheema. The totality of the circumstances establish that Cheema was a well known pro-India figure, who was a known enemy and persecutor of Sikh militants, acting in support of anti-Sikh government actions after he left political office. That TADA violations were also charged is another element that makes it more likely than not that his killing was incidental to the political uprising. The theft of the arms and ammunition in connection with an attack on a political opponent was also incidental to the uprising. These facts preponderate to establish the political offense exception for the charges in F.I.R. No. 94.

f. *April 26, 1992 Charges (Case No. F.I.R. 34)*

This April 26, 1992, encounter involved four individuals, two gunmen, Suda Ram and Jasbir Singh, both of whom were constables, and Balwant Singh Sarhal, former member of the legislative assembly (MLA) and Amar Nath Kanugo, of the Deputy Commissioner Office, Jalandhar, who were driving in a Gypsy vehicle in the Village Garhi Mohan Singh where they were attacked by Barapind, Gurdeep Singh, and Harjinder Singh, who opened fire and shot and killed all four occupants of the Gypsy vehicle. Two of the occupants of the Gypsy were constable-gunmen, who were accompanying Balwant, an ex-government official (MLA) and Amar Nath Kanugo of the Deputy Commissioner Office, who was also a government official. TADA viola-

tions are also charged arising out of this incident.

The evidence establishes that a former government official, active government official, and their police-affiliated body guards were driving in a village, presenting a target of opportunity. All these individuals were agents of the State or former agents of the State. Nirmal Singh is said to have given a statement in Annex. K/6 that identifies Barapind, who Nirmal states he knows from his Ilaga. Nirmal states that Chubear Singh also identified Barapind in this attack. The evidence does not explain any other circumstances of the attack or motives for the killings. Whether this attack was a domestic terrorist attack or politically motivated cannot be determined. If the fact that India charged under TADA, a political crimes law is sufficient standing alone, a political offense exception could be shown. The evidence equally supports the finding the crimes were acts of domestic terrorism. No other evidence to show political activity or motive was presented. Under the totality of the evidence Barapind's proof does not preponderate. Barapind shall be extradited for the F.I.R. 34 crimes.

2. *Other Charges*

a. *September 6, 1992 Charges (Case No. F.I.R. 89)*

These charges for murder and robbery under Sections 302, 392, and 34 of the India Penal Code, arise from the incident where Barapind and his accomplices are accused of shooting and killing three police collaborators and one of their wives. No TADA crimes are charged. Though the three brothers were not per se agents of the State, as they held no official positions, they were armed adversaries, supported by Indian official police agencies, who were struggling to defeat the Sikh separatists.

India's affidavits admit that the three brothers were issued arms and ammunition by the Punjab police for "self-defense." *See Aff. of Sohan Singh, Annexure D/1.* Barapind presents evidence that not only were the three brothers armed by the police, they were also given police uniforms and participated with the Indian security forces in hunting Sikh militants. *See e.g. Aff. of Balhar Singh, Def. T 9.*

India argues that since the three brothers were "local thugs" who terrorized the population, their deaths are more likely revenge killings. In view of the crimes allegedly committed by the three brothers against citizens, this theory is more than speculation. The three brothers were essentially paramilitary operatives and opponents of the supporters of the Khalistan movement. The evidence shows it is more likely than not that their killings and the related theft of their weapons and ammunition were incidental to the uprising, even if a partial motive was reprisal or revenge.

Although the murders of the three brothers were incidental to the uprising, F.I.R. 89, also includes a murder charge for the death of Kulwant Kaur, the wife of Karamjit Singh, one of the slain brothers. Kulwant was killed when Barapind's accomplices allegedly broke into her bedroom in order to kill her husband. Barapind presents no evidence to show that she was either an agent of the Indian state or in any way an opponent of the Khalistan movement or an appropriate target in an uprising. The record is silent as to the exact circumstances under which Kulwant was killed. It is speculation whether Kaur was armed when the intruders broke into her bedroom. Likewise whether Kaur was executed in cold-blood for being the spouse of a mercenary or simply because she was present, is unknown.

Although the *Quinn* dicta could be extended to cover Kulwant's murder without knowing the exact circumstances surrounding her death (e.g., her death ensured that she could not identify the militants or she was killed to avoid disclosure of the militant's strategies) the burden of going forward is on Barapind to provide facts that establish the political offense exception. Barapind, who has the burden, has not provided evidence to show that the killing of Kulwant was anything but the murder of an innocent by-stander, non-combatant civilian. As to this incident Barapind only presents evidence of political motives for the killing of the three brothers. Except for a mention in a footnote, India has not analyzed Kulwant's death. There is no evidence that Kulwant in any way participated in her husband's activities or had any political role.

Other courts that have considered the "incidental to" component have ruled that the allowance U.S. courts make for violent crimes in the context of a civil war or uprising is inapplicable to shield the knowing effort to kill or injure unarmed, uninvolved, innocent civilians who are non-combatants in the struggle. *See Ahmad*, 726 F.Supp. at 405–408; *Eain*, 641 F.2d at 520–521; *In the Matter of Extradition of Marzook*, 924 F.Supp. 565, 577 (S.D.N.Y. 1996); *Demjanjuk*, 612 F.Supp. at 570 (N.D.Ohio 1985) ("The civilian status of the victims is also significant because the United States does not regard the indiscriminate use of violence against civilians as a political offense").

Barapind rests his argument entirely on *Quinn. Quinn*'s dicta has no application on these facts. Nor does it stand for the proposition that merely because one is a political revolutionary, this status creates a license to kill innocent civilians with impunity, as long as armed adversaries are also simultaneously killed. It is significant that in other residential killings charged, wives and other non-combatants, were not killed. See case No. F.I.R. 52. Barapind fails to

prove the killing of Kulwant was causally or ideologically related to the uprising. He fails to satisfy the "incidental to" prong. Barapind shall be certified for extradition for the murder of Kulwant Kaur in Case No. F.I.R. 89.

b. *October 26, 1991 Charges (Case No. F.I.R. 100)*

This incident concerns the charges of murder of Sahib Singh Sahbi and attempted murder of Makhan Ram under Sections 302, 307, and 34 of the India Penal Code. TADA violations are also charged. The shooting and wounding of Makhan Ram and Sahib Singh Sahbi, took place on October 26, 1991. Makhan and Kulwant were driving a scooter on their way to visit Makhan's sister in Mohalla Dhakka Colony, Phillaur, Jalandhar District, and while crossing the railway tracks were confronted by Barapind and Gurdeep Singh. Both Makhan and Sahib were shot, Makhan was wounded twice and Sahib was killed. There is no evidence that Makhan Ram or Sahib Singh Sahbi were police, government agents, associated with Indian forces, or political opponents of Barapind. No political objective related to the uprising that concerns Makhan and Sahbi justifies the attempted murder and wounding of Makhan and murder of Sahib on October 26, 1991. That TADA crimes were also charged in and of itself does not establish the offenses were political. These crimes are not "incidental to" any uprising. Barapind has offered no evidence that these crimes were related to any uprising. The political offense doctrine does not protect random acts of violence. Barapind shall be certified for extradition for the attempted murder and murder charged in F.I.R. 100.

C. *Charges For Which Probable Cause Has Not Been Established.*

█ In the event it should become relevant, the cases for which probable cause

has not been established are analyzed for applicability of the political offense exception.

1. *F.I.R. No. 52*

These charges concern murder and conspiracy to murder Karwan Singh and Kulwinder Singh. Barapind was also charged under TADA for these killings. Barapind does not dispute the evidence that this was a revenge killing by Ranjit Singh for the murder of his father, Gurnek Singh, by Sarwan Singh, for which Sarwan Singh was convicted.

This is a case in which Rajinder Kaur recanted her 1991 identification in court under oath in 1997 and then again allegedly identified Barapind in 1998. Her identifications were too unreliable to be competent evidence. Jaswinder Singh, son of the murdered Sarwan Singh, has also testified that Jaswinder did not identify Barapind and Ranjit Singh as two of the assailants. Jaswinder was not present when his father was killed and does not know who killed his father. He denies that he ever identified Barapind or Ranjit Singh.

Barapind has offered no evidence that Sarwan Singh or Kulwinder Singh had any political activity, were agents of the Indian government, or were legitimate targets in the political uprising. Barapind does not dispute that Sarwan Singh murdered the father of Ranjit Singh, which provides motive for a revenge killing. There is a total failure of proof by Barapind to establish the killings of Sarwan Singh and Kulwinder Singh were political offenses or incidental to a political uprising.

2. *F.I.R. No. 87*

These charges for murder and attempted murder arise out of the shooting of

Ram Tirath, Tarlochan Singh and Jaspal Singh. Rakan Singh, an agriculturalist, around 60 years old, while traveling to attend a religious ceremony in a Jeep belonging to Ram Tirath, who was driving, Tarlochan Singh, his gunman, and Jaspal Singh, another passenger. Barapind is charged with TADA crimes in F.I.R. No. 87.

Barapind submits no evidence showing that any of the victims of case F.I.R. 87 has political status, was involved in any activity that concerned Sikh separatists, or that there was any political reason for their murders and attempted murder. The fact that TADA crimes were charged is not enough standing along. The political offense exception is not established.

### 3. F.I.R. No. 220

These charges are for the murders of Darshan Singh Kaypee and Ashok Kumar, and robbery. TADA crimes are also charged.

Barapind's evidence shows that Kaypee is an ex-minister of Punjab. No evidence is presented as to whether Kaypee continued to have political activity, whether he was an enemy of Sikh militants, whether he was engaged in any political or other activity that would give rise to political motive justification for his shooting. Other than the evidence that Kaypee was a former agent of the Punjab state and inferentially the Indian government, and the fact that charges were brought under TADA, there is no evidence that the murder and robbery were political offenses. India argues that the killing could as likely have been a revenge killing for Kaypee's former service on behalf of Punjab and India. Barapind's evidence does not preponderate to establish the political offense exception for F.I.R. No. 220.

### VIII. BARAPIND'S REQUEST FOR HUMANITARIAN EXCEPTION CONSIDERATION

Barapind requests that in the event extradition is granted that the "part of the record in this Court" which refers to his treatment at the hands of the Indian Government be considered. Testimony from Vincent Jacopino, M.D., described his investigation and clinical observation of torture victims and human rights violations carried out in the Punjab by Punjab police against Sikh militants. He has testified over 200 times in asylum cases. Barapind has been permitted to make an offer of proof based on the "possibility of a humanitarian exception to extradition," premised on his interpretation of *Mainero,* 164 F.3d at 1210; *Emami,* 834 F.2d at 1452, 1453; *Arnbjornsdottir–Mendler v. United States,* 721 F.2d 679, 683 (9th Cir.1983); *Gallina v. Fraser,* 278 F.2d 77, 78 (2d Cir.1960); and *Escobedo v. United States,* 623 F.2d 1098, 1105 (5th Cir.1980) (humanitarian claims implicate separation of powers and should be left to Secretary of State), 18 U.S.C. § 3186.

Barapind recognizes the rule of non-inquiry, 18 U.S.C. § 3184, "gives no discretion to the judicial officer to refuse to certify extraditability on the ground that a treaty partner cannot assure the requested country that rights under a treaty will be enforced or protected." *United States v. Kin–Hong,* 110 F.3d 103, 115 (1st Cir.1997). The rule requires that extradition courts not undertake inquiries into the justice system of foreign countries, nor the procedures or treatment which await a surrendered fugitive in the requesting country. *See Cornejo–Barreto v. Seifert,* 218 F.3d 1004, 1009, n. 5 (9th Cir.2000); *Ahmad v. Wigen,* 910 F.2d 1063, 1066–67 (2d Cir.1990) (citing *Sindona v. Grant,* 619 F.2d 167, 174 (2d Cir. 1980)).

█ Barapind's claims he will be tortured or executed if surrendered to India are not cognizable in the extradition proceeding. See *Cornejo–Barreto*, 218 F.3d 1004; *Sandhu v. Burke*, 2000 WL 191707, *8 (S.D.N.Y. Feb. 10, 2000). Such humanitarian concerns may be addressed in Barapind's asylum proceeding before the BIA, subject to judicial review on habeas corpus. Barapind has made an offer of proof that is part of the record. India's objection to admission of this evidence is sustained. It cannot be considered in the extradition court.

### IX. *JUDGMENT AND ORDER*

For the reasons stated above, IT IS CERTIFIED that the evidence submitted by the government of India is sufficient to establish probable cause to believe that Kulbir Singh Barapind has committed the offenses of: (1) murder of Kulwant Kaur charged in F.I.R. 89; (2) the murders of Kulwant Singh, ex-MLP, Aman Nath Kanigo, Soda Ram, and Jasbir Ram as charged in F.I.R. 34; (3) and murder of Sahib Singh aka Sahbi and attempted murder of Makhan Ram as charged in F.I.R. 100. The EXTRADITION of Barapind as requested by the Government of India IS GRANTED for these crimes. The attorneys for India shall, within five (5) days following date of service of this decision by the clerk, lodge a form of CERTIFICATION OF EXTRADITABILITY to be transmitted to the Secretary of State of the United States, in accordance with this decision and the requirements of law. Once executed, the Clerk of Court shall transmit to the Secretary of State of the United States: (1) a certified copy of the CERTIFICATION OF EXTRADITABILITY; (2) a copy of all evidence received in the extradition proceeding and a certified copy of the testimony taken in the proceedings on February 9, 13, 14, 15, 16 and March 2, 2001; (3) a certified copy of this Memorandum Decision and Order; and (4) a certified copy of the complaint and request for extradition and Annexures (exhibits) thereto. A warrant may issue upon the requisition of a duly-authorized representative of the Government of India for the surrender of Barapind in accordance with the terms of the Treaty. Barapind shall continue to be detained pending final outcome of these proceedings.

SO ORDERED.

### CERTIFICATION AND ORDER OF EXTRADITABILITY

Pursuant to this Court's Memorandum Decision and Order Re Extradition filed on August 27, 2001 and attached hereto as Exhibit A, this Court finds that Kulvir Singh Barapind is extraditable for the offenses of: (1) the murder of Kulwant Kaur as charged in F.I.R. 89; (2) the murders of Kulwant Singh, Aman Nath Kanigo, Soda Ram, and Jasbir Ram as charged in F.I.R. 34; and (3) the murder of Sahib Singh aka Sahbi and the attempted murder of Makhan Ram as charged in F.I.R. 100 and hereby certifies this finding to the Secretary of State as required under Title 18, United States Code, Section 3184.

This matter is before the court on the Government of India's ("India") complaint and request for extradition of Kulvir Singh Barapind ("Barapind"). India is represented by Sara Criscitelli, Esq., Office of International Affairs, United States Department of Justice, and Assistant United States Attorney Stanley A. Boone, Esq. Barapind is represented by Karen L. Snell, Esq., and Jagdip Singh Sekhon, Esq.

September 18, 2001.